UNITED STATES of America

v.

Julio PEREZ–CESTERO, Defendant.

No. 78 Cr. 0640 (KTD).

United States District Court,
S.D. New York.

Feb. 23, 1990.

---

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for the U.S.; David Raymond Lewis, Asst. U.S. Atty., of counsel.

Robert M. Baum, The Legal Aid Soc., Federal Defender Services Unit, New York City, for defendant; Paul Davison, of counsel.

KEVIN THOMAS DUFFY, District Judge:

Defendant Julio Perez–Cestero moves pursuant to Fed.R.Crim.P. 12 and 48(b) to dismiss the indictment on ground that further prosecution would violate Perez–Cestero's speedy trial rights under the Sixth Amendment, or, in the alternative, granting a hearing on the motion.

### FACTS

Except where noted, the uncontested facts are as follows.[1]

---

1. This statement of facts is taken largely from  the Government's papers in opposition to Perez–

## A. *Perez' Years As A Fugitive*

On September 11, 1978, Perez–Cestero was indicted in this case for conspiracy to distribute narcotics. The indictment was sealed and a bench warrant was issued on that date. The indictment charged Perez–Cestero with participating in a heroin distribution conspiracy involving the bloodthirsty Jaime Vila Organization.[2]

On September 18, 1978, Perez–Cestero was arrested by Drug Enforcement Administration ("DEA") agents in Puerto Rico. He appeared that same day before the Honorable Hernan Desquiera, United States District Judge for the District of Puerto Rico. Over government objection, Judge Desquiera set bail at $100,000, to be posted by September 20, 1978. Until such bond was posted, Perez–Cestero was released on his own recognizance. Lewis Affid. ¶ 4. Perez–Cestero was thus apprised of the federal narcotics charges out of the Southern District of New York at the time he was arrested in Puerto Rico. *See* Perez–Cestero Decl. at 3.

Perez–Cestero failed to appear in the District Court of Puerto Rico on September 20, 1978. Instead, he has admitted to "hiding out in Puerto Rico for a few days" and then "travell[ing] to Venezuela via the Dominican Republic." Perez–Cestero Decl. at 3.

The same day that Perez–Cestero fled, the Government obtained a bench warrant from the United States District Court in Puerto Rico. In this court, on September 28, 1978, the Government obtained authorization for the issuance of a second warrant from the district judge assigned to Part I, Hon. Robert J. Ward. Lewis Affid. ¶ 8.

Meanwhile, two additional warrants for Perez–Cestero were issued in California. On September 30, 1978, the Los Angeles County ("L.A.") District Attorney's Office obtained an indictment charging Perez–Cestero with two execution-style murders in California; a corresponding state warrant was issued that day.[3]

The California charges involved Perez–Cestero's alleged execution of one Ralph Dennis, whom Perez–Cestero reportedly believed was a confidential informant, and Dennis' female companion. In addition, based upon a complaint filed with a United States magistrate in the Central District of California, a fourth bench warrant was issued on December 21, 1978, charging Perez–Cestero with unlawful flight to avoid prosecution ("UFAP"). Lewis Affid. ¶ 9.

By December 21, 1978, the Federal Bureau of Investigation ("FBI") and the United States Marshals Service entered all four of these warrants into the National Criminal Information Center ("NCIC") system. That NCIC entry served to notify most federal, state, and local authorities that Perez–Cestero was a fugitive. Lewis Affid. ¶ 10.

Primary responsibility for the effort to locate and apprehend Perez–Cestero was assigned to the FBI fugitive section in Los Angeles. In December 1978, that section contacted DEA offices in New York and Puerto Rico, as well as the Los Angeles Police Department, to obtain any biographical information about Perez that might prove useful in apprehending him. Lewis Affid. ¶ 11.

In January and February 1979, at least seven persons were interviewed in Puerto Rico regarding Perez–Cestero's where-

Cestero's motion. *See* Affidavit of David Raymond Lewis ("Lewis Affid.").

**2.** The two previous trials of members of the Jaime Vila Organization of which I am aware featured testimony and Section 3500 material in which a number of murders are described. Two of the more heinous took place when the "gang" tied one victim to a ping-pong table and dismembered him with a chain-saw. The other victim may have died of a heart attack while watching the torture of the first, and after being told that the same fate awaited him. The Medical Examiner could not be sure of the cause of death because that body was also dismembered. There is no indication before me now that this defendant was in any way directly responsible for these acts.

**3.** Perez–Cestero was thus not apprised of the California charges when he fled Puerto Rico. Those charges had not yet resulted in an indictment, and California authorities expressed concern about the possible flight of other targets if that ongoing murder investigation was revealed. Lewis Affid. ¶ 6.

abouts, including his wife and mother. Perez–Cestero's wife and mother both refused to answer questions except to state that they did not know Perez–Cestero's whereabouts. Lewis Affid. ¶ 12.

The FBI obtained information that Perez–Cestero had a serious stomach illness and had been hospitalized at the University of Minnesota Medical Center in Minneapolis, Minnesota. As a result, the FBI office in Minneapolis contacted the University of Minnesota Police Department in January 1979 and alerted the hospital to place "stops" on his records there. Further interviews were conducted with the hospital in April 1979. Lewis Affid. ¶ 13. Additional checks made in Minneapolis in January 1979, including checks of motor vehicle records and driver's license records, all proved negative. Lewis Affid. ¶ 14.

Later in January 1979, the FBI obtained information from the United States Attorney's Office in the Southern District of New York that related to Perez–Cestero's health, checking account, insurance records, and personal habits. In February 1979, the FBI in New York confirmed Perez–Cestero's birth records and checked New York City Police Department arrest records with negative results. Lewis Affid. ¶¶ 15–16.

In March 1979, the FBI Office in Los Angeles contacted FBI Offices in Puerto Rico, Boston, Louisville, Houston, New Haven, New York, and Washington. Information was forwarded regarding Perez–Cestero's telephone records, medical records, insurance, personal habits, and vital information. Lewis Affid. ¶ 17. Meanwhile, Perez–Cestero had his Venezuelan status upgraded from "tourist" to "transient" in March 1979. Perez–Cestero Decl. at 3–4.

In April 1979, telephone checks were made in Miami and Minneapolis, also without success. The FBI Office in Louisville, Kentucky pursued a lead that Perez–Cestero had a keen interest in dog shows and dog breeding, particularly the Boxer breed. Interviews were conducted in Louisville regarding that information. The FBI conducted at least six additional interviews in Puerto Rico in April 1979, and checked with Perez–Cestero's insurance company. His family again indicated that they did not know Perez–Cestero's whereabouts. In April and May 1979, former physicians of Perez–Cestero were interviewed in Massachusetts and New York. Lewis Affid. ¶¶ 18, 20–21.

Also in April 1979, the FBI Office in Washington consulted Perez–Cestero's passport records through the United States Department of State. Those records disclosed that Perez had obtained a passport in Puerto Rico in 1976. Lewis Affid. ¶ 19.

In May 1979, the FBI obtained information that Perez–Cestero was being treated for his stomach ailment at the Mayo Clinic in Rochester, Minnesota. Interviews and records checks were conducted there with negative results. Surveillance was also established there, and "stops" were placed with numerous Clinic personnel, all with negative results. Interviews of several associates of Perez–Cestero were also conducted in New York City in May 1979. Lewis Affid. ¶¶ 22–23.

The FBI arranged for a "stop" card to be filed with the Immigration and Naturalization Service in June 1979, in order to apprehend Perez–Cestero if he attempted to enter or leave the country. Lewis Affid. ¶ 24.

During the summer of 1979, the FBI interviewed numerous individuals in Puerto Rico near Perez–Cestero's wife's residence and at several dog clubs. They conducted additional telephone checks and checks of police records, all with negative results. Surveillance was conducted on at least two dog shows in September and November 1979. Lewis Affid. ¶ 25.

In the spring of 1980, at least six individuals, including Perez–Cestero's wife, were interviewed in New York and Puerto Rico. "Spot checks" were conducted at two residences. Lewis Affid. ¶ 26.

The FBI requested a five-month "mail cover" on Perez–Cestero's wife's residence in May 1980. That mail cover went into effect in July 1980. As a result of the mail cover, leads were followed in six states and in five cities in Puerto Rico. A lead was also identified regarding correspondence

from a dog club in Venezuela. That information was forwarded to the FBI Office in Los Angeles, with instructions to consider forwarding it to the FBI legal attache in Bogota, Colombia, who had primary responsibility for FBI activities in Venezuela. Lewis Affid. ¶ 27.

In Puerto Rico, during June and July 1980, the FBI obtained telephone records for at least four new telephone numbers, and examined records of the Department of Motor Vehicles and an insurance company with which Perez–Cestero held a policy. A stop notice was placed at the Department of Motor Vehicles. Approximately five "spot checks" were performed at various residences and locations. The FBI also interviewed two dog breeders in Connecticut in June 1980, with negative results. Lewis Affid. ¶¶ 28–29.

In August and September 1980, the FBI made at least fourteen additional contacts, conducted two spot checks at Perez–Cestero's former residence and at least seven more at the homes of Perez–Cestero's family members and others, and interviewed hospital and business contacts. Lewis Affid. ¶¶ 30–31.

In the last three months of 1980, the FBI conducted at least thirteen additional interviews, including Perez–Cestero's family members, friends and associates, as well as a dog breeder and members of a dog club. Lewis Affid. ¶ 32. In October 1980, the FBI developed unverified information that Perez–Cestero's daughter had reportedly received a letter from Perez–Cestero approximately one year before, from an undetermined location in South America. Lewis Affid. ¶ 33.

The FBI conducted at least sixteen interviews in the first six months of 1981. The subjects included members of dog clubs, physicians, and possible associates. Based on information that Perez–Cestero had a fixation with guns, interviews were also conducted with members and owners of gun clubs nationwide. Lewis Affid. ¶ 34.

In May 1981, based on information developed through the mail cover on Perez–Cestero's wife's home, the FBI requested its legal attache in Bogota to investigate two Venezuelan addresses. Neither of those addresses was one at which Perez now claims to have resided during his years as a fugitive. Lewis Affid. ¶ 35.

Also in May 1981, a memorandum was prepared for dissemination outside of the FBI, detailing the basic information known about Perez–Cestero and noting that he was considered armed and extremely dangerous. In August 1981, that memorandum was distributed to the Venezuelan government's office of "Interpol", the international police organization. Lewis Affid. ¶ 36.

In July 1981, the FBI's legal attache in Bogota requested that the Los Angeles office forward additional identifying information regarding Perez–Cestero. In October 1981, Perez–Cestero's photograph and fingerprints were forwarded to the Venezuelan office of Interpol, in Caracas. Lewis Affid. ¶¶ 37, 40.

In August 1981, the FBI conducted more interviews in the United States with members of dog clubs. At least three additional interviews of Perez–Cestero's friends and fellow dog breeders were conducted in December 1981. Lewis Affid. ¶¶ 38, 42.

In September 1981, the FBI in Puerto Rico investigated the endorsement of a check apparently bearing Perez–Cestero's signature. That lead proved negative. Lewis Affid. ¶ 39.

In November 1981, the FBI again interviewed Perez–Cestero's wife in Puerto Rico. She told the FBI she believed Perez–Cestero was dead as a result of his severe stomach illness. Lewis Affid. ¶ 41.

On December 22, 1981, the FBI office in Los Angeles received a communication from the FBI's legal attache in Bogota, Colombia, forwarding information from Venezuelan Interpol. Interpol reported that Perez–Cestero was believed to be residing at Calle 14, No. 22–58, San Cristobal, Tachira, Venezuela. The chief of the Venezuelan Interpol office advised that Perez–Cestero was in Venezuela legally, and was therefore not deportable. The FBI legal attache in Bogota noted that any attempt to extradite Perez–Cestero should be coor-

dinated with the American Embassy in Caracas and with the Venezuelan Interpol office. Lewis Affid. ¶ 43.

The United States' extradition treaty with Venezuela did not then provide for extradition of narcotics offenders, although it did for murder. Lewis Affid. ¶¶ 74, 80. Accordingly, on December 28, 1981, the FBI forwarded its information about Perez–Cestero's whereabouts to the Los Angeles Police Department, so that Perez–Cestero could be returned to the United States to face the murder charges in California. The Los Angeles Police Department stated that they would "exhaust every possible effort" to obtain Perez–Cestero's extradition to Los Angeles for trial. They requested that the FBI's legal attache in Colombia be apprised of their high level of interest. They further requested that Perez–Cestero not be made aware of such activities in the interim, because they believed he would flee if he learned that his whereabouts were known. Lewis Affid. ¶ 44.

The next week, the Los Angeles Police Department informed the FBI that they and the L.A. District Attorney's Office were proceeding with extradition through the offices of the Governor of California and the State Department. Consequently, on January 6, 1982, the FBI determined that no further action was needed by the FBI at that time. Lewis Affid. ¶ 45.

On March 24, 1982, the FBI office in Los Angeles notified the New York office to discontinue its fugitive search because Perez–Cestero had been located in Venezuela. The New York office was told to update the DEA in New York, and was advised that further action by federal authorities would be held in abeyance because extradition proceedings were underway by Los Angeles authorities. Lewis Affid. ¶ 46.

On May 4, 1982, the FBI in New York communicated to the FBI in Los Angeles that the DEA in New York had been apprised and was reviewing its files. The New York office concurred that no further federal action appeared necessary at that time since the Los Angeles Police Department was actively seeking extradition. Indicating the seriousness of California's interest, the New York office also stated that California authorities were reportedly investigating Perez–Cestero for the slaying of a law enforcement officer in California. Lewis Affid. ¶ 47.

In May 1982, an official of the Office of International Affairs ("OIA") communicated to the FBI that it had yet to receive any communication from California authorities regarding possible extradition. OIA further asked to be apprised of what method of extradition California authorities were pursuing. A communication from FBI headquarters to the Los Angeles and New York field offices on May 13, 1982 indicated that the Los Angeles office should reactivate the matter and should again contact California authorities to expedite their request for Perez–Cestero. Lewis Affid. ¶ 48.

On May 14, 1982, the FBI office in Los Angeles informed headquarters that it had learned that the Los Angeles Police Department was pursuing Perez–Cestero's extradition through the extradition section of the L.A. District Attorney's Office. The District Attorney's Office advised the FBI that it was awaiting a ruling from the California Attorney General as to what procedures should be pursued to secure Perez–Cestero's return. The District Attorney's Office also noted that it had favorable past experience with deportation through the California Attorney General's Office, rather than extradition. The District Attorney's Office indicated that if the California Attorney General determined that deportation was not appropriate, the District Attorney's Office would contact the United States Department of State to initiate formal extradition proceedings. Lewis Affid. ¶ 49.

On June 30, 1982, the L.A. District Attorney's Office wrote to OIA, requesting assistance in initiating deportation proceedings. As indicated in that communication, Perez–Cestero's status was somewhat problematic in that, although he was a United States citizen, he also apparently had a Venezuelan national identification number. Lewis Affid. ¶ 50.

On July 13, 1982, OIA wrote to the United States Department of State to request that Perez–Cestero's passport privileges be revoked. OIA forwarded various identifying information, and apprised the State Department that Perez–Cestero might be using the alias "Hestero." In that same letter, OIA forwarded to the State Department the passport number it had received from the L.A. District Attorney's Office. For reasons that are not apparent, this was not the number for the passport Perez–Cestero was later found to be carrying. Lewis Affid. ¶ 52. Unbeknownst to OIA, Perez–Cestero had in fact obtained a new passport from the American Embassy in Caracas in 1981. Lewis Affid. ¶ 73. On July 13, OIA also wrote to the office of Interpol in Washington, asking them to inquire of Venezuelan Interpol whether Perez–Cestero was deportable. Lewis Affid. ¶ 53.

On July 27, 1982, the State Department informed OIA that it had sent a telegram regarding passport revocation to State Department posts in Venezuela. The State Department also indicated that it had entered a notice in its system both domestically and worldwide that would alert the State Department if Perez–Cestero sought documentation elsewhere. Lewis Affid. ¶ 54.

On July 29, 1982, according to a subsequent letter to OIA from Interpol in Washington, American Interpol forwarded OIA's request for assistance in apprehending Perez–Cestero to Venezuelan Interpol in Caracas. Lewis Affid. ¶ 55.

On September 14, 1982, the FBI fugitive section in Los Angeles informed headquarters that, in light of the continuing efforts of the L.A. District Attorney's Office to have Perez–Cestero returned to the United States, no further FBI action appeared necessary at that time. Lewis Affid. ¶ 56.

On February 28, 1983, the L.A. District Attorney's Office wrote to the United States Department of State, requesting to be apprised of the prospects for success, and the current status, of the attempts to deport Perez–Cestero. Lewis Affid. ¶ 57.

On March 17, 1983, the State Department replied, indicating that it had not received a reply to its earlier request to State Department offices in Venezuela that sought to verify Perez–Cestero's presence in Venezuela. The State Department stated that a second telegram was being sent to State Department Offices in Venezuela. Lewis Affid. ¶ 58.

In June 1983, and again in September 1983, the FBI was in communication with the L.A. District Attorney's Office, but no progress was reported in the attempt to deport Perez–Cestero. Lewis Affid. ¶ 59. By his own admission, Perez–Cestero had his Venezuelan status upgraded from "transient" to "resident" in September 1983. Perez–Cestero Decl. at 4.

In December 1983, the L.A. District Attorney's Office was in communication with the State Department, primarily inquiring about the status of the Perez–Cestero matter. Lewis Affid. ¶ 61.

In January 1984, by his own admission, Perez–Cestero changed his residence. Perez–Cestero Decl. at 4. Also in January 1984, the FBI again inquired of the L.A. District Attorney's Office regarding the attempts to deport Perez–Cestero, but was told there had been no positive developments. Lewis Affid. ¶ 63.

On January 24, 1984, the American Embassy in Caracas sent a telegram to the State Department in Washington. The Embassy had been informed that a Julio Perez–Cestero had at one time lived at the suspected address on Calle 14 in San Cristobal. However, the Embassy telegram noted a number of discrepancies between that subject and the State Department inquiry. Whereas FBI records then and now indicate that defendant Perez–Cestero is 5'8″ tall and was born in 1933, Venezuelan records indicated an individual approximately 5'5½″ tall and some 20 years younger, with a birth date in 1953. Nonetheless, the Embassy indicated that it had asked Venezuelan authorities to determine whether the subject continued to reside at the suspected address. Lewis Affid. ¶ 64.

In April 1984, in an effort to expedite the proceedings, the FBI again became in-

volved in attempts to secure Perez–Cestero's return. On May 3, 1984, the FBI's legal attache in Bogota was asked to confirm Perez–Cestero's residence at the address on Calle 14 in San Cristobal, Venezuela. However, after consultation with the attache, the FBI concluded that it would not be advisable to go forward with a second such request to Venezuelan authorities. This conclusion was based on the FBI's belief that Perez–Cestero was extremely dangerous, and on the fact that considerable time had passed since the last verification of Perez–Cestero's residence with no formal request for his extradition. The FBI determined that the best course would be to secure a formal request from the State Department or OIA before again seeking action by Venezuelan authorities. Lewis Affid. ¶ 65.

In May 1984, the FBI had discussions with a variety of State Department officials, officials at the American Embassy in Caracas, and Venezuelan authorities. It was agreed that no action should be taken until Venezuelan authorities had received an official State Department request. Concern was again expressed that Perez–Cestero was both extremely dangerous and prone to flight. It was agreed that he should be arrested immediately upon any contact. Lewis Affid. ¶ 66.

On May 23, 1984, the FBI contacted OIA and the L.A. District Attorney's Office in an effort to expedite the proceedings against Perez–Cestero. Because of Perez–Cestero's status—as a United States Citizen with an apparently valid Venezuelan national identification card—and because Perez–Cestero faced both narcotics charges and murder charges, the OIA expressed uncertainty about whether the 1923 treaty between the United States and Venezuela would provide for extradition. Lewis Affid. ¶ 67.

In late May 1984, OIA contacted Interpol in Venezuela. Venezuelan Interpol reported that Perez–Cestero could not be located. Interpol reported that Perez–Cestero's presence at the Calle 14 address in San Cristobal—or indeed his presence in Venezuela at all—could not be confirmed. Lew-

is Affid. ¶ 68. In fact, Perez–Cestero admits that he was no longer living at the Calle 14 address. Also in late May 1984, the FBI performed a check of airline travel for anyone using Perez–Cestero's name or suspected aliases, with negative results. Lewis Affid. ¶ 69.

In the following weeks, a series of communications took place between OIA, the L.A. District Attorney's Office, the California Attorney General's Office, DEA in New York, and the FBI. There was disagreement among these offices as to whether Perez–Cestero was deportable. The L.A. District Attorney's Office argued that deportation was preferable, noting that Perez–Cestero is a United States citizen. However, OIA pointed out that Venezuelan authorities had expressed reservations about deportation because Perez–Cestero reportedly had a valid Venezuelan national identification card. OIA thus favored extradition. The L.A. District Attorney's Office expressed reservations, indicating that extradition at that time posed a considerable administrative burden and presented potential problems. Lewis Affid. ¶ 70.

On July 30, 1984, American Interpol responded to an FBI inquiry about the Perez–Cestero deportation request. American Interpol stated that it had received no reply from Venezuelan Interpol to its earlier request, despite follow-up requests. The American Interpol noted that the request to Venezuelan Interpol authorities was being renewed. Lewis Affid. ¶ 71.

In late July 1984, the FBI's legal attache in Bogota met with State Department officials and Venezuelan police authorities in Caracas. Venezuelan police again reported that they had investigated "the last three addresses" for Perez–Cestero but had been unable to locate him. Venezuelan police indicated they were continuing their investigative activities in an effort to locate Perez–Cestero. Lewis Affid. ¶ 72.

At that same meeting in late July 1984, the FBI learned from the American Embassy that Perez–Cestero had obtained a new United States passport in Caracas on May 27, 1981. That passport remained valid through May 26, 1986. The Los Angeles

FBI office was instructed to enter the new passport information into its computer system. Lewis Affid. ¶ 73. "Alerts" for Perez–Cestero were placed with the consular section at the Embassy. Lewis Affid. ¶ 84.

In August and September 1984, OIA and the L.A. District Attorney's Office continued discussions of California's deportation request. OIA expressed the view that Perez–Cestero was not deportable and that he could not be extradited on the federal narcotics charges. OIA suggested that extradition on the California murder charges appeared to be the best option. The L.A. District Attorney's Office apparently expressed doubt about whether they had the resources available at that time to prepare an immediate extradition request. Lewis Affid. ¶ 74.

In September and October 1984, the FBI legal attache in Bogota was extensively involved in meetings and communications with the new administration in the Venezuelan justice ministry, Venezuelan police, Venezuelan Interpol, DEA, and undisclosed sources. The communications and sources of information were considered highly confidential and sensitive. The FBI stressed the need for a coordinated approach in order to prevent any problems for Venezuelan authorities and to protect the lives of confidential sources. Lewis Affid. ¶ 75. In regard to possible extradition of Perez–Cestero, the FBI was advised by OIA again in October 1984 that extradition presented problems because the extradition treaty between the United States and Venezuela did not provide for extradition for capital offenses or narcotics crimes. It was also noted that, if Perez–Cestero was extradited to California on the murder charge, he could be tried only for the charge set forth in the extradition warrant, and could not then be tried on the narcotics charges in the Southern District of New York. Lewis Affid. ¶ 76.

On October 4, 1984, the FBI attache in Bogota learned that Perez–Cestero was or had been a member of a pistol association in Venezuela, and that he had provided an address upon registration. However, the address he listed in registering for that club was not one of the three addresses where Perez–Cestero now claims to have lived in Venezuela. Lewis Affid. ¶ 77.

On October 1, 1984, the FBI contacted the United States Customs Service, and requested that an alert be placed in the Treasury Enforcement Communication System ("TECS"). The FBI was informed that such alert would remain in effect for 90 days, and should be placed only when the FBI had specific information regarding Perez–Cestero's anticipated entry into the United States. The FBI further requested a search of Customs' computer records. Later in October 1984, Customs informed the FBI that the search had revealed over 100 records corresponding to the name "Julio Perez Cestero" or any of Perez–Cestero's suspected aliases. Customs indicated it would try to narrow down the number of potential leads. Lewis Affid. ¶ 78.

In late October 1984, the FBI office in Los Angeles contacted the L.A. District Attorney's Office in an attempt to precipitate a formal extradition request from that office. The District Attorney's Office indicated that it was not prepared to go forward with a formal extradition request at that time, in part because it already had a deportation request pending. Lewis Affid. ¶ 79.

In January 1985, due to a lack of progress with the California extradition proceedings, the FBI contacted the United States Attorney's Office in the Southern District of New York regarding the possibility of obtaining Perez–Cestero's presence directly on the instant charges. After consultation with OIA, OIA confirmed that Perez–Cestero could not be extradited on the instant charges to this court. Lewis Affid. ¶ 80. Throughout January and February 1985, the FBI was in repeated contact with the L.A. District Attorney's Office in an attempt to expedite a formal extradition request from that office. Lewis Affid. ¶ 81. On February 5, 1985, the L.A. District Attorney's Office informed the FBI that it wanted a confirmed address in Venezuela in order to prepare its formal extradition package. On March 4, 1985, another formal request was made to Vene-

zuelan police authorities regarding Perez–Cestero's possible whereabouts. Lewis Affid. ¶ 82.

Throughout March and April 1985, the L.A. District Attorney's Office prepared and sent out a variety of affidavits and other information for use in support of their anticipated extradition request. However, at least one affiant, an important confidential informant, was not immediately available. Lewis Affid. ¶ 83.

In a communication dated March 21, 1985, the FBI attache in Bogota stated that "alerts" had previously been placed with the consular section at the American Embassy in Caracas, regarding Perez–Cestero's passport status. The attache noted that such alerts would be reposted. Lewis Affid. ¶ 84. On March 20, 1985, Venezuelan authorities again informed the FBI attache in Bogota that Perez–Cestero could not be located. Venezuelan authorities indicated that they had investigated the former address on Calle 14 in San Cristobal, as well as two other former addresses, all with negative results. Lewis Affid. ¶ 85.

Once the FBI learned that Perez–Cestero could not be located, it forwarded a series of inquiries to the L.A. District Attorney's Office regarding possible future courses of conduct. A central subject of concern was whether the District Attorney's Office was still ready and able to proceed with its prosecution. Lewis Affid. ¶ 86. During the remainder of 1985 and early 1986, the L.A. District Attorney's Office undertook some limited additional investigation. It was ultimately decided, however, that they did not wish to reestablish contact with sensitive cooperating witnesses until and unless Perez–Cestero was located. Lewis Affid. ¶ 87. The files do not indicate that any additional leads on Perez–Cestero's whereabouts were developed during 1986. Lewis Affid. ¶ 88.

In January 1987, United States Interpol notified FBI Headquarters that it had made numerous requests of Venezuelan Interpol, with no reply. Later in January 1987, FBI Headquarters inquired of the FBI office in Los Angeles regarding any developments in the case. Lewis Affid. ¶ 89.

In February 1987, the FBI office in Los Angeles again contacted the L.A. District Attorney's Office regarding whether it still believed it could present its case. The District Attorney's Office indicated that it did wish to proceed. The FBI office in Los Angeles anticipated additional activity in the near future. Lewis Affid. ¶ 90.

B. *Perez–Cestero's Arrest and Subsequent Proceedings in California*

On April 27, 1987, Perez–Cestero travelled to the American Embassy in Caracas, apparently to obtain a new United States passport. Based on "stops" placed at the Embassy through the efforts of the FBI, Embassy officials summoned Venezuelan authorities and apprised them that Perez–Cestero was at the Embassy. Venezuelan authorities arrested Perez–Cestero at the Embassy and held him in custody for three days. During that time, Venezuelan authorities considered Perez–Cestero's expulsion on the basis of his status as a fugitive from the United States. On April 30, 1987, Venezuelan authorities expelled Perez–Cestero. Lewis Affid. ¶ 91.

On April 30, 1987, Perez–Cestero was transported by the United States Marshals Service to Miami, where he was held on the federal UFAP charges out of Puerto Rico. Shortly thereafter, federal authorities in Puerto Rico informed the Marshals Service that they would forego their UFAP prosecution in favor of the more serious double-murder charges in California. The United States Attorney's Office in the Southern District of New York also determined that the more serious California charges should be allowed to proceed first. Accordingly, no steps were taken to transport Perez–Cestero to this district at that time. Lewis Affid. ¶ 92. Before being transported to California, Perez–Cestero was held in custody in Miami pending a determination of his identity. His fingerprint records ultimately confirmed his identity. On May 13, 1987, Perez waived extradition to California; and on May 20, 1987, the L.A. Police Department transported Perez–Cestero

from Miami to Los Angeles. Lewis Affid. ¶¶ 93–95. The United States Attorney's Office lodged a detainer against Perez–Cestero on May 27, 1987 in order to obtain his presence when the California proceedings were concluded. Lewis Affid., Exh. B. A copy was served upon Perez–Cestero. Davison Affid., Exh. H.

On May 27, Perez–Cestero was presented for arraignment in the "Arraignment and Pleas" part of the Superior Court in Los Angeles County. Perez–Cestero waived any speedy trial objections at that appearance and at every single subsequent appearance before the California court. Perez–Cestero continuously gave such waivers until June 9, 1989. On that date, he waived objection until June 23, 1989 plus sixty days. Lewis Affid., Exh. C. Between May 27, 1987 and June 23, 1989, Perez–Cestero's own motions for adjournments account for all of the delay except the last two weeks, which was by motion of the court. All told, twelve months of delay is attributable to Perez–Cestero's own motions alone and 9½ months is attributable to joint motions of both the People and Perez–Cestero. At no time did the People make any motion for an adjournment other than those motions joined by the defendant. Lewis Affid., Exh. C.

On June 23, 1989, after an evidentiary hearing, the trial court in California issued an oral ruling from the bench dismissing the murder indictment on speedy-trial grounds, based upon a finding that the L.A. District Attorney's Office had not exercised due diligence in attempting to bring Perez–Cestero to trial. *See* Davison Affid., Exh. I. The California court further found that Perez–Cestero's failure to assert his right to a speedy trial in California could not be counted against him, because he had never been advised of the California murder charges.[4]

By letter dated June 23, 1989, the same date the California court dismissed the murder indictment, Perez–Cestero wrote to the United States Marshals Service requesting that the federal prosecution in this court go forward. Davison Affid.,

Exh. J. After nearly 11 years, this was the first time that Perez–Cestero made any effort to assert his right to a speedy trial. Records do not indicate when the Marshals received Perez–Cestero's first letter. Lewis Affid. ¶ 100. Apparently on that same date, the L.A. District Attorney's Office moved for a rehearing. Perez–Cestero continued to be held in California pending the disposition of that motion.

On July 10, 1989, the California trial court denied rehearing. By letter to the United States Marshals Service dated July 17, 1989, Perez–Cestero asserted his right to a speedy trial for the second time. Davison Affid., Exh. J. Records do not indicate when that letter was received. Lewis Affid. ¶ 102.

On July 25, 1989, the United States Marshals Service was informed for the first time that Perez–Cestero was being released from California custody and that the detainer out of the Southern District of New York could be executed. The Marshals took custody of Perez–Cestero on August 2, 1989, and transported him to the Southern District of New York on August 19, 1989. Lewis Affid. ¶ 103.

On Monday, August 21, 1989, Perez was taken before United States Magistrate Barbara A. Lee and arraigned on the instant charges.

Perez–Cestero's motion to dismiss contends that his speedy trial rights were violated during two distinct time periods: "the period September 1978 through April 1987, during which defendant lived openly and notoriously as a fugitive in Venezuela; and (2) the delay from April 1987 through August 1989, which resulted from the fact that federal authorities did not bring the defendant to the Southern District of New York after his apprehension, but instead released him to the state authorities for prosecution on local charges in Los Angeles, California." Defendant's Memorandum at 1–2.

## DISCUSSION

■ In *Barker v. Wingo* the Supreme Court enunciated the four factors that trial

---

4. Notice of appeal has apparently been recently filed by the L.A. District Attorney's Office.

courts should consider in determining whether a criminal defendant's speedy trial rights under the sixth amendment have been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972). No single factor, however, is "either a necessary or sufficient condition to the finding of a deprivation of the right," and courts are required to conduct a sensitive balancing process whereby the conduct of *both* the prosecution and the defendant are weighed. *Id.* at 530, 92 S.Ct. at 2191.

### I. Perez–Cestero's Fugitivity in Venezuela

The first period on which Perez–Cestero bases his sixth amendment claim is the eight and a half years between September 1978, when he first fled to Venezuela, and April 1987, when he was arrested.

The first *Barker* factor, length of delay, "is to some extent a triggering mechanism" that indicates whether it is necessary to review the other factors. It is uncontested here that the eight-and-a-half year delay between Perez–Cestero's indictment in the Southern District and his arrest is presumptively prejudicial, thereby requiring examination of the remaining three factors.

### A. *Reason for Delay*

■ This case turns on the Government's reasons for delay in bringing Perez–Cestero to trial. The Government is not only charged with the burden of bringing a criminal defendant swiftly to trial, but is also obligated to exercise "due diligence" in attempting to locate and apprehend the defendant, even if he is a fugitive fleeing prosecution. *Rayborn v. Scully,* 858 F.2d 84, 90 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989). The court's determination of whether the Government has made sufficient efforts to satisfy the "due diligence" requirement is "fact-specific." *Id.*

■ Perez–Cestero argues that the Government's lack of diligence is evidenced by the fact that he was not apprehended despite his contact over the years with various Venezuelan officials and the American Embassy. He points out that he annually renewed his Venezuelan tourist visa until March 1979, when his status was changed to transient. Thereafter he renewed his transient visa annually until September 1983, when he became a resident. On October 17, 1979 he received a Venezuelan identification card in his true name. The FBI learned on December 22, 1981 that he was living at Calle 14 in Tachira, Venezuela, the address at which he claimed he remained until 1984. Finally, on May 27, 1981, he renewed his United States passport at the United States Embassy in Caracas.

Although, with the benefit of hindsight, Perez–Cestero was apparently living a rather conspicuous existence in Venezuela, there is no evidence of the Government's lack of diligence. Moreover, Perez–Cestero's efforts to evade apprehension cannot be disregarded. After being arrested on the instant indictment, and taken before a federal magistrate to be apprised of the charges against him, Perez–Cestero immediately went into hiding and ultimately fled the country. He admits that after jumping bail he hid in Puerto Rico for a few days. Perez–Cestero Decl. at 3. From Puerto Rico, he fled to the Dominican Republic and then to Venezuela. While in Venezuela, Perez–Cestero lived at at least three different locations, all along the Colombian border. Perez–Cestero Decl. at 4. Intelligence information also suggests that he may have lived at two other addresses as well. Lewis Affid. ¶¶ 72, 77, 85. Moreover, regarding at least his first Venezuelan residence, the records of Venezuelan authorities reflected a description of someone several inches shorter and twenty years younger than Perez. Lewis Affid. ¶ 64. Furthermore, while twice corresponding with his wife in Puerto Rico, he admittedly placed false names on the envelope. Perez–Cestero Decl. at 4. He also instructed her to minimize phone contact. Perez–Cestero Decl. at 4–5. And in registering with at least one gun club in Vene-

zuela, he provided a false address. Lewis Affid. ¶ 77.

■ In contrast, the record before me reveals considerable, not to say exceptional, efforts by the FBI on its own and in enlisting the aid of officials at OIA, the State Department, the American Embassy in Caracas, American Interpol, Venezuelan Interpol, the L.A. District Attorney's Office, and the Venezuelan Government. Although Perez–Cestero was under no obligation to take affirmative steps to ensure that he would be tried in a timely fashion, "a court need not ignore a defendant's fugitivity in considering whether there has been a violation of his sixth amendment right to a speedy trial." *Rayborn*, 858 F.2d at 90. Moreover, law enforcement officials are "not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown." *Id.*; *see United States v. Diacolios*, 837 F.2d at 83 (due diligence does not require government to pursue that which is "futile"). A defendant's speedy trial claim is seriously undercut when the defendant, not the Government, is the cause of the delay. *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989).

In addition, recent cases in this circuit involving speedy trial claims make clear, by comparison, that the Government's efforts here satisfy the due diligence standard. For example, in *Rayborn*, a fugitive from New York remained at large in Pennsylvania for four-and-a-half years. The efforts of New York authorities to find the defendant there, which were not as comprehensive as those made by the Government to find Perez–Cestero, and which included a fourteen-month period of complete inactivity, were found by the Second Circuit to satisfy the due diligence standard. 858 F.2d at 86. Similarly, in *Blanco* the Second Circuit found that the Government's efforts to apprehend the defendant over a 10–year span were sufficiently diligent.

Those efforts included having an agent investigate defendant's whereabouts and attempt to keep track of her through an informant, the filing of a fugitive report with the National Criminal Information System and the Treasury Enforcement Communications System, passport and visa "lookouts" filed by DEA, the search for the defendant in Miami hospitals after she was reported injured, and the search for her body after she was reported killed. 861 F.2d at 778. The court also found that a nine-month delay in arresting the defendant after she was spotted in California was justified on the basis of avoiding risk to an informant's life and not jeopardizing an ongoing investigation involving defendant's sons. *Id.* at 779.

■ Furthermore, the Government's failure to obtain extradition of Perez–Cestero from Venezuela does not indicate a lack of due diligence. A formal request for extradition need not be made before due diligence can be found to exist. *United States v. Diacolios*, 837 F.2d 79, 83 (2d Cir.1988) (Government did not fail to exercise due diligence by not seeking extradition where it was United States policy not to seek extradition outside of extradition treaty with Greece). Moreover, the Government was not obliged to seek extradition where such a request would undoubtedly be unavailing. *See Blanco*, 861 F.2d at 778 (Government under no duty to request defendant's extradition from Colombia where such a request would have been futile, given that the Colombian president had made clear that he would not enforce the extradition treaty). Prior to 1986, Venezuela's extradition treaty with the United States did not provide for the extradition of narcotics offenders. *See* Treaty of Extradition between the United States of America and Venezuela, Jan. 19–21, 1922, 43 Stat. 1698, T.S. No. 675; *see also United States v. Agreda*, 612 F.Supp. 153 (E.D.N.Y.1985) (no legal way DEA could have compelled defendant to return from Venezuela).[5] Nor, of course, did the Government

---

5. Extradition between the United States and Venezuela originally came into force through the Treaty of Extradition Between the United States of America and Venezuela, 43 Stat. 1698, T.S. No. 675 (1922). Article II of that treaty enumerates those offenses that are extraditable;

have a duty to seize Perez–Cestero in Venezuela. *See Blanco*, 861 F.2d at 779.

Thus the only available means of extraditing Perez–Cestero prior to 1986 was on the basis of murder charges filed in California.[6] After 1986 the FBI had no information regarding Perez–Cestero's whereabouts. Despite the FBI's efforts and its worldwide notices to the U.S. State Department and embassies and to foreign governments, it did not know whether Perez–Cestero was even still in Venezuela. Lewis Affid. ¶¶ 64, 68–69, 72–73, 77–78, 84. The week that FBI efforts resulted in Perez–Cestero being found, he was arrested and returned to the United States.

In similar circumstances in which a defendant fled to Venezuela, the lodging of a warrant with Venezuelan authorities satisfied the Government's constitutional duty. *See Garcia Montalvo v. United States*, 862 F.2d 425, 426 (2d Cir.1988). And in *Agreda*, the court found that the Government's failure to attempt to locate the defendant in Venezuela, to realize that the defendant was using his true name in regularly traveling to United States, to alert the United States Embassy in Venezuela and Customs, and to investigate details of a shooting in which defendant was wounded did not violate defendant's speedy trial rights. 612 F.Supp. at 158. The court held that there was no legal way that DEA could compel defendant to return from Venezuela, that the DEA did not have sufficient facts to conduct a meaningful investigation with respect to the shooting, and that it had no

reason to believe that the defendant would openly return to the United States following the murder of his cousin and codefendant and an attempt on his own life. *Id.* Significantly, the court also found that knowledge of the defendant's location by the state authorities should not be imputed to the Federal Government, nor was it reasonable to hold that the Government should have found and apprehended the defendant on one of his many trips to Miami absent "some type of reasonable lead." *Id.* at 158–59. Moreover, as in *Agreda*, there is no allegation here that the Government deliberately delayed in apprehending the defendant. *See also Blanco*, 861 F.2d at 778–79 (efforts sufficient to return fugitive from Colombia, despite lack of extradition request).

Neither can the federal authorities be faulted for relying upon the efforts of the L.A. District Attorney's Office to seek Perez–Cestero's return. Indeed, Perez–Cestero concedes that the Second Circuit permits the Government to rely on the efforts of another jurisdiction to locate a fugitive and bring him to trial. *See, e.g., Rayborn*, 858 F.2d at 91. In *Rayborn*, the Second Circuit held:

> [A] state is perfectly entitled to rely in good faith upon the efforts of another jurisdiction when a suspect for whom an arrest warrant has been issued evades arrest in the first state and absconds to that other jurisdiction. Such reliance, if reasonable and grounded in the belief that the helping jurisdiction is in fact

murder is listed, narcotics offenses are not. A treaty providing for extradition from Venezuela for narcotics offenses came into force for the first time in 1986, pursuant to Article 14 of the multilateral Protocol Amending the Single Convention on Narcotic Drugs of 1961, reported at T.I.A.S. No. 8118, 26 U.S.T. 1439 (1972). As provided in Articles 17 and 18, the Protocol enters into force in a signatory country thirty days after it is properly ratified and an instrument of ratification is deposited with the designated depositary. In the United States, the Protocol entered into force in 1975. *See* 26 U.S.T. at 1439. However, the Protocol did not come into effect in Venezuela until January 3, 1986. *See* Affid. of George Taft, ¶ 2.

**6.** In contrast to the facts before the California Superior Court that dismissed the California

indictment, extradition on the narcotics charge was not an option available to federal authorities. Moreover, the California court did not have before it, as I do here, a situation in which Perez–Cestero failed to assert his right to a speedy trial. Instead, because of the decision by the California authorities in 1978, Perez–Cestero was never apprised of the California charges before absconding. Thus Perez–Cestero's failure to assert his speedy trial right could not be weighted against his motion under the *Barker* analysis. And even if I were to conclude that the California authorities could have acted with greater diligence, that would weigh less heavily against the Government in the instant case than it would against California in the murder prosecution.

conducting a proper investigation, must be permitted. . . .

*Id.* at 91. In considering the efforts of New York and Philadelphia law enforcement officials in *Rayborn* to apprehend the defendant, the court held New York's reliance on the Philadelphia authorities to be proper, noting that "in evaluating New York efforts to apprehend [the defendant] and bring him to trial, we may also consider the efforts expended by Philadelphia during this same period." 858 F.2d at 91.

The FBI here did not take a "back seat" to the California authorities. Indeed, it was the FBI's efforts, in alerting American Embassies worldwide, that ultimately lead to Perez–Cestero's capture. While Perez–Cestero was successfully avoiding apprehension, the FBI expended considerable efforts to locate him. Once he was located, the FBI forwarded the relevant information to the California authorities and repeatedly attempted to assist them in obtaining Perez–Cestero's presence in the United States. Lewis Affid. ¶¶ 44–90. In 1984, when California requested that Perez–Cestero's whereabouts in Venezuela be verified, the FBI repeatedly attempted to locate him. Lewis Affid. ¶¶ 64, 68–69, 72–83, 77–78, 84. That these efforts were unsuccessful at that time does not speak to the FBI's lack of diligence. And in January 1985, the FBI was again informed by the OIA that the United State's extradition treaty with Venezuela did not provide for extradition on narcotics charges, and that the only practicable avenue for securing Perez–Cestero's return to the United States remained extradition on the California charges. Lewis Affid. ¶ 80. The FBI then continued to attempt to expedite that process through the California authorities. The FBI thus could not have taken a more active role. Under these circumstances, I cannot say that the Government's efforts were insufficient or that its reliance on the California authorities was unreasonable.

And even if I were to find that the Government was negligent in relying on the California authorities, which I do not, negligent delays, although a factor to be considered, "should be weighed less heavily against the government than deliberate delays intended to hinder the defense." *Rayborn*, 858 F.2d at 91. In *Rayborn*, defendant's trial on New York narcotics charges was delayed for four-and-a-half years while he was a fugitive, an additional thirty-three months while he remained in custody of another jurisdiction, and during the next twenty-seven months when he was actually serving his sentence there. The Second Circuit attributed the latter delay to a "series of clerical mishaps" and "lack of oversight" as the defendant's case was "lost in bureaucratic limbo." 858 F.2d at 87. The court went on to find that "approximately eighteen to twenty-three months of the delay was the result of the State's negligence." *Id.* at 90. However, the court held that the defendant did not have a speedy trial claim because the Government's negligence was outweighed by the defendant's flight, particularly in light of his failure to assert his right to a speedy trial and failure to demonstrate actual prejudice. *Id.* at 94.

Nor is there any indication in the record before me that the delay here was intentional or brought about for a tactical advantage, through deliberate procrastination, or in bad faith. *See Rayborn*, 858 F.2d at 92 (the court found it "more important" that there was nothing in the record to suggest that the delay had been purposeful in order to gain a tactical advantage); *cf. William Flowers v. Warden*, 853 F.2d 131, 132 (2d Cir.1988), *cert. denied*, 488 U.S. 995, 109 S.Ct. 563, 102 L.Ed.2d 588 (1988) (no sixth amendment violation even though only reason for 17–month delay, during which defendant was unable to post bail and remained incarcerated, was court docket congestion).

Thus, I find that the second *Barker* factor, reason for the delay, tips decidedly in favor of the Government on the facts before me. In light of the Government's considerable, albeit unsuccessful, efforts to find him, Perez–Cestero's sixth amendment claim is severely undermined. Virtually the entire eight-and-a-half year delay is attributable to Perez–Cestero's fugitivity. As such, his claim that the Government failed to pursue him with adequate zeal

rings hollow, considering that "by any apparent assessment [he] was a bail jumper and an absconderer," *Rayborn*, 858 F.2d at 91. Perez–Cestero must therefore bear responsibility for the first period of delay in this case.

■ Even if I had found negligence and lack of diligence on the part of the Government, those factors alone do not mandate dismissal. *Rayborn*, 858 F.2d at 92. Consideration of the two remaining *Barker* factors is necessary.

## B. *Failure to Assert Right*

Perez–Cestero, unlike the situation regarding the California murder charges, was obviously fully apprised by a federal magistrate of the charges outstanding against him on the instant indictment. He then deliberately chose to flee rather than face trial. His failure to assert his rights during his eight-and-a-half years as a fugitive in Venezuela accordingly weighs heavily against his sixth amendment claim.

■ Although failure to assert the right does not necessarily act as a waiver, such failure will make it difficult for a defendant to assert his right successfully at a later point. *Rayborn*, 858 F.2d at 92. The speedy trial requirements should "not operate to reward a recalcitrant and reluctant defendant." *United States v. Schreiber*, 535 F.Supp. 1359, 1363 (S.D.N.Y.1982). When "it is manifestly apparent that a defendant has no serious interest in the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated." *Rayborn*, 858 F.2d at 92.

Perez–Cestero, unsurprisingly, made no attempt to assert his right during his years of fugitivity in Venezuela. He asserted his speedy trial right only after he was arrested and the California charges were dismissed. Thus, his status as a bail jumper and fugitive during much of the delay significantly weakens his speedy trial claim.

## C. *Lack of Actual Prejudice*

The final *Barker* factor to be considered is prejudice to the defendant. The Supreme Court has identified three interests which the speedy trial right was designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. The *Barker* court also noted that "the most serious" of these is the last, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* The Supreme Court thereafter elaborated:

> The Sixth Amendment right to a speedy trial ... is not primarily intended to prevent prejudice to the defense caused by the passage of time.... The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless, substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982).

Under these guidelines, there was virtually no prejudice to Perez–Cestero due to the delay here. There obviously was no pretrial incarceration between the date of the indictment and the date of his arrest; once free on bail, Perez–Cestero immediately absconded to Venezuela, where he remained a fugitive until his arrest. As such, his burden of anxiety and concern is of little moment. In addition, Perez–Cestero points to no prejudice to his right to prepare an adequate defense. Indeed, he admits that he cannot articulate in what way his ability to defend has been impaired. Defendant's Memorandum at 10. A mere "possibility of prejudice is not sufficient" to tilt the fourth *Barker* factor in Perez–Cestero's favor. *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986).

■ Moreover, courts need not be easily persuaded by claims of prejudice by delay

when the defendant is responsible for such delay. *See Blanco*, 861 F.2d at 780. A defendant's blanket assertion that delay in itself gives rise to prejudice lack force; such delay can just as easily hurt the Government's case. *Id.*[7] Consistent with other courts before me, I am reluctant to find a speedy trial violation in the absence of genuine prejudice. *See, e.g., Rayborn*, 858 F.2d at 94.

Like the *Rayborn* court, which ultimately held that the defendant's "initial fugitivity and subsequent failure to assert his right in a vigorous and timely manner, coupled with the absence of any prejudice to his defense, militate against accepting" his speedy trial claim, 858 F.2d at 94, I hold that Perez–Cestero's speedy trial claim as to the first eight-and-a-half years of delay must fail.

## II. Delay During Perez–Cestero's Custody in California

The second time period on which Perez–Cestero bases his motion runs from April 30, 1987, when he was returned to the United States, until August 2, 1989, when he was taken into federal custody on the indictment at issue here. During those twenty-seven months, Perez–Cestero was in the custody of the State of California, engaged in proceedings involving the murder charges against him there. Because the length of this delay is also substantial, analysis of the three remaining *Barker* factors is necessary.

### A. *Reason for Delay*

#### 1. Decision to proceed on California charges first

Perez objects to the Government's decision to allow the California prosecution to proceed before prosecution of the federal charges in this court. The Second Circuit,

however, has recognized the propriety of allowing a proceeding on a more serious state charge to go forward first. In *United States v. Oliver*, 523 F.2d 253 (2d Cir. 1975), the Government dismissed a previously issued writ of habeas corpus ad prosequendum, which would have brought the defendant to federal court to face federal charges, to allow a state murder prosecution to proceed. Although the defendant's federal case was delayed thirteen months by the pendency of those state charges, the Second Circuit held that the Government's decision to dismiss the writ was "reasonable" because it allowed the prosecution of the more serious state charge to proceed. Thus, no violation of the defendant's speedy trial rights had occurred. 523 F.2d at 259. In *Oliver*, as in the instant case, the state murder charge had been brought several months after the less serious federal charges. *Id.* at 256–57.

Although the conspiracy charge Perez–Cestero faces in this court is quite serious, the charges he faced in California, in which he was accused of an execution-style double slaying, are no doubt more severe. Delay in one or the other case was inevitable. A choice had to be made about which was to proceed first. Given that neither prosecution was in a meaningfully active posture, the choice to proceed with the California murder prosecution, which carried a possible term of life imprisonment, rather than the federal prosecution for narcotics conspiracy, carrying a possible term of fifteen years imprisonment, was a logical and reasonable choice. Thus the Government did not abdicate its responsibility to bring Perez–Cestero to trial by allowing the California prosecution to proceed first. In light of the circumstances, that decision was both appropriate and unsurprising.[8]

---

**7.** In *Barker*, the Supreme Court recognized that deprivation of the right to a speedy trial may work to the accused's advantage:

Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to

counsel or the right to be free from compelled self-incrimination, deprivation of the right to a speedy trial does not *per se* prejudice the accused's ability to defend himself.

407 U.S. at 521, 92 S.Ct. at 2187.

**8.** The Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.*, while inapplicable to Perez–Cestero's claim, is instructive by analogy. Section 3161(h)(1) excludes from the speedy trial calculation any delay resulting from "other proceedings con-

### 2. Delay attributable to California proceedings

■■■■ The reason for the twenty-seven month delay while the California prosecution was proceeding also weighs against Perez–Cestero's speedy trial claim.

Essentially all of the delay during the months that the California prosecution was proceeding was attributable to Perez–Cestero himself. During that time, Perez–Cestero's own motions for adjournments—usually made alone but sometimes made jointly with the prosecution—account for all the delay except the last two weeks, which are the result of the court's own motion. Lewis Affid., Exh. C. Because the reason for the delay was of Perez–Cestero's own making, it cuts heavily against him under this *Barker* factor. *See Barker*, 407 U.S. at 534, 92 S.Ct. at 2194 (more important than the absence of serious prejudice is fact that defendant did not want a speedy trial as evidenced by defendant's failure to object to eleven continuances granted to state over four-year span).

### B. *Failure to Assert Right*

Perez–Cestero again allowed years to pass without making an attempt to assert his right to a speedy trial. The California docket reflects that at every appearance in the California Superior Court—totalling twenty-three appearances over twenty-five months—Perez–Cestero and his counsel waived any speedy trial objection. Lewis Affid. ¶¶ 97–98, citing Exh. C. Similarly, Perez–Cestero made no request regarding his right to a speedy trial on the federal narcotics charge until twenty-five months had passed after his arrest, and after the state charges were dismissed. In the five weeks following his demand of such rights, the Marshals took custody of Perez–Cestero.

As *Rayborn* makes clear, Perez–Cestero's belated assertions of his right are entitled to little or no weight. In *Rayborn*, the defendant's first request for a speedy trial did not come until nearly seven years after the crime and over three years after he had been informed of the charge. Although the defendant subsequently moved to dismiss the indictment, the Second Circuit agreed with the district court that the defendant simply "raised his protests too lamely and too late." 858 F.2d at 93. While a defendant's assertion of the right is ordinarily accorded strong weight, the court there found that "the lack of timeliness, vigor or frequency" of defendant's assertions militated against according it such weight. *Id.* at 93. *See Blanco*, 861 F.2d at 780 (since defendant only asserted her sixth amendment claim after her arrest, third *Barker* factor did not help her case). Likewise, Perez–Cestero's assertion of his speedy trial right here was too belated to weigh significantly in his favor.

### C. *Lack of prejudice.*

Perez–Cestero has not set forth any way in which his ability to defend himself has been prejudiced by the twenty-seven month delay. Indeed, it is hard to fathom how, after more than eight years of delay attributable to Perez–Cestero's own fugitivity, the additional two years while he was in custody in California could give rise to prejudice. Relying on the mere passage of time is simply not enough. Again, I am reluctant to find a speedy-trial violation in the absence of genuine prejudice. Thus, together with the other *Barker* factors, lack of prejudice weighs heavily against Perez–Cestero's claim.

Because the facts are in essence uncontested, and the parties' dispute focuses solely on application of the law, there is no necessity for an evidentiary hearing. After weighing the *Barker* factors, I find that Perez–Cestero's right to a speedy trial was not violated, his motion to dismiss the indictment is denied.

The matter is set down for a conference on Wednesday, February 28, 1990 at 10:00

cerning the defendant", including delay "resulting from trial with respect to other charges against the defendant." § 3161(h)(1)(D). *See United States v. Nesbitt*, 852 F.2d 1502 (7th Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 808,

102 L.Ed.2d 798 (1989) (18–month delay in defendant's prosecution on federal narcotics charges due to pendency of state murder charges properly excludable under Speedy Trial Act).

a.m. in Courtroom 705 in order to set a trial date.

SO ORDERED.