UNITED STATES of America

v.

**Juan AGREDA, Defendant.**

**No. 78 CR 350.**

United States District Court,
E.D. New York.

June 19, 1985.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Patricia A. Pileggi, Asst. U.S. Atty., Brooklyn, N.Y., for the U.S.

Michael G. Dowd, Kew Gardens, N.Y. and Bronis & Portela by Stephen J. Bronis, Miami, Fla., for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant moves pursuant to the Sixth Amendment to the United States Constitution and Rule 48(b) of the Federal Rules of Criminal Procedure to dismiss the indictment herein on the ground that his rights to a speedy trial have been violated in that the indictment in the instant case was returned on June 20, 1978, and that he was not arrested until February 10, 1985.

On its return the indictment was sealed and was not thereafter unsealed until defendant's friend and co-defendant Bernabe Oliveras was arrested and arraigned thereon on July 22, 1981.

During the entire period between the return of the indictment and the date of his arrest the defendant has been a resident and a citizen of his native country of Venezuela, where he has lived (according to the testimony of his daughter) in four or more separate houses with his wife, son and daughter. His daughter also testified that the defendant was unaware of the pending indictment against him until he was arrested on February 10, 1985.

The testimony at the evidentiary hearing was further clear that during the period between indictment and arrest the defendant had undertaken a number of commercial transactions in the United States and in connection therewith had regularly traveled to the United States, making numerous trips thereto using passports and visas issued to him under his true name.

Moreover, on or about November 2, 1981, while the defendant was in Miami, Florida on one of these business trips, he was shot and wounded by one or more unidentified person or persons. During his treatment at Jackson Memorial Hospital he was interviewed by police officers about the shooting and various reports were made of the incident. Subsequent to his discharge from such hospital he traveled to and convalesced in Florence, Alabama.

In its memorandum the Government sets forth an interesting "Statement of Facts", a substantial portion (if not all) of which it presumably intends to prove at the trial and which we set forth in full herein so that the reader may be apprised of the nature of the Government's claims:

"In 1977, Eduardo Pernia Bonnett, a cooperating source, provided DEA agents with details of a large cocaine smuggling conspiracy whose membership included the defendant Agreda and which was responsible for the monthly importation into the United States of approximately 100 pounds of cocaine. Bonnett described one of the methods of importation as involving the acquisition of cocaine from laboratories in Colombia and the transportation of that cocaine to Venezuela. In Venezuela, the defendant arranged for 30–50 kilogram quantities to be placed on Venezuelan ships. This cocaine was then transported to Miami. In Miami, the defendant arranged for the offloading of the cocaine. The cocaine was then transported by car or by Amtrak's Autotrain to New York where the defendant supervised the distribution of the cocaine.

"Bonnett decided to cooperate with the Drug Enforcement Administration after the defendant Agreda and others threatened to kill Bonnett because they believed he had stolen $240,000 from them. Prior to Bonnett's coopertion, Bonnett had made reservations at the Hilton Hotel, 1335 Avenue of the Americas, New York for Agreda. Agreda brought a suitcase containing $240,000, the proceeds of cocaine distributions, to the hotel. After leaving the suitcase in that room, Agreda claimed that Bonnett had stolen the case from the hotel room.

"After the disappearance of this cash, Agreda and co-defendants Bernabe Oliveras, Jose Selimo Garcia, and Juan Manuel confronted Bonnett at his residence. Agreda threatened to kill Bonnett. Co-defendant Bernabe Oliveras interceded on behalf of Bonnett, asking that Bonnett's life be spared. Oliveras pointed out that Bonnett's father was a presidential candidate in Colombia and that he (Oliveras) was related by marriage to Bonnett. Agreda and the others were persuaded by Oliveras. After this incident, Bonnett contacted federal agents and began providing information concerning the importation of cocaine by Agreda and his co-conspirators.

"Bonnett's debriefings included his admission that on March 9, 1977, he smuggled $200,000 of currency in a false bottom suitcase out of the United States and into Colombia for Agreda and co-defendants Jose Selimo Garcia and Hector Chacon. Jose Selimo Garcia and Hector Chacon escorted Bonnett to the John F. Kennedy International Airport where he departed for Colombia. In Colombia, Agreda met Bonnett at the airport.

"During this trip to Colombia, Bonnett learned of the group's plans to import twenty kilograms of cocaine to the United States. The cocaine was to be driven from Bogota, Colombia to Caracas, Venezuela. Then, in Caracas, the defendant Agreda was to turn the twenty kilograms over to a Venezuelan ship's captain. This ship would transport the cocaine to Miami. From Miami, the cocaine would be transported to New York.

"On March 13, 1977, Bonnett returned to New York, and was contacted by Oliveras

who asked Bonnett to keep 35 kilograms of cocaine in Bonnett's apartment. Subsequently, at Oliveras' request, Bonnett met Oliveras at the apartment. During the course of Bonnett's meeting with Oliveras, Agreda came to the apartment, picked up a large quantity of cocaine, placed it in a suitcase and left.

"At the request of DEA agents, Bonnett consented to the recording of phone conversations with Agreda as well as with co-defendants Bernabe Oliveras, Mendoza, and Jose Selimo Garcia. In addition, Bonnett wore a Nagra recorder during meetings with Agreda and Oliveras. During these discussions, particularly those with Agreda, frequest references were made to the cash taken from Agreda's hotel room. Bonnett also discussed, with Agreda, various ways that he could help Agreda recover the lost cash. Specifically, on August 10, 1977, Agreda offered to sell 'pure' cocaine to Bonnett at $32,000 per kilogram. In this same conversation, Agreda indicated to Bonnett that he did not expect Bonnett to pay him for the lost cash and that he considered the stolen funds 'a campaign contribution,' an apparent reference to Bonnett's father.

"On June 21, 1978, a sealed indictment was filed, in the Eastern District of New York charging the defendant, and fourteen co-defendants, with conspiring to import substantial quantities of cocaine into the United States, in violation of Title 21, United States Code, Section 963. Arrest warrants were issued for each of these individuals.

"In July of 1978, the defendant's name was entered into 'Narcotics and Dangerous Drugs Information System' (NADDIS) and Treasury Enforcement Computer System (TECS). The information entered into this system provided all federal criminal investigators with Agreda's name, the charges contained in the indictment and a brief description of these charges. Because Agreda's date of birth was unknown, federal agents were unable to enter information concerning Juan Agreda into National Crime Information Computer (NCIC) which would have given state and local law enforcement officers direct access to information concerning the indictment and arrest warrant outstanding against Agreda. At the time the indictment was returned, DEA agents knew, as a result of information provided by Bonnett, that Agreda resided in Caracas, Venezuela and that he travelled to Miami and New York using false documentation. In addition, Bonnett provided agents with a telephone number used by Agreda in Caracas in 1977. DEA agents also obtained information from the business records of the Hilton Hotel, 1335 Avenue of the Americas, New York, New York where Agreda stayed in 1977. These busines records revealed that a Juan Agreda, a Venezuelan citizen, stayed at this hotel.

"In September of 1981, after receiving information from the Hilton Hotel and Bonnett, a request was made to the DEA District Office in Caracas, Venezuela for subscriber information pertaining to the phone number provided by Bonnett. In addition, DEA District Offices in Caracas, Venezuela and Bogota, Colombia were asked to provide current intelligence on Juan Agreda. DEA agents made further requests for information concerning Agreda of the District Office in Caracas, Venezuela in April of 1982.

"Between the filing of the indictment, in 1978, and 1981, fifteen additional individuals were arrested during the course of DEA's continuing investigation into this group's importation of cocaine. Individuals arrested included Agreda's co-defendant Bernabe Oliveras. With each arrest, DEA agents attempted to ascertain, through the questioning of cooperating individuals as well as through analysis of documents seized, the whereabouts of Agreda. No new information was obtained until June of 1982, when a confidential source, advised DEA agents that Agreda was living in Caracas, Venezuela. That source further stated that Agreda was involved in the transportation of between 40 and 100 kilograms of cocaine from Brazil to Venezuela and ultimately Miami. This source also informed agents that, during a dispute con-

cerning his cocaine business, Agreda was shot in Miami, Florida. This source further stated that Agreda was recovering, in a hospital in Greece, from these wounds and that he was having one of his arms amputated. The confidential source provided DEA agents with two telephone numbers used by Agreda in Caracas. These telephone numbers were different from those previously provided by Bonnett.

"Because the confidential source did not know the date or location of the shooting incident, nor the name of the hospital where Agreda was treated, and because this new information indicated that Agreda was in Greece, DEA agents did not make inquiries of the City of Miami or Miami Beach police departments concerning Agreda's whereabouts.

"In June of 1982 the DEA case agent requested that the DEA District Office in Caracas, Venezuela provide him with subscriber information concerning the telephone numbers provided by this Confidential Source. Further requests for information were made of the Caracas District Office in August of 1982 and February of 1983.

"In June of 1984, Juan Agreda applied for a visa at the United States Embassy in Caracas. Officials at the United States Embassy learned, through NADDIS, that Agreda was a fugitive. Agreda again applied for a visa on January 19, 1985. The United States Embassy was advised to grant him a visa and to ascertain his travel plans. The embassy complied and determined that Agreda intended to enter the United States through Miami on February 10, 1985. This information was relayed to DEA.

"Agreda was subsequently arrested on February 10, 1985 at the Miami airport."

At the evidentiary hearing, Special Agent Arthur Anderson of the Drug Enforcement Agency testified that the DEA was unaware of the defendant's numerous trips to and business in the United States and of the injury he sustained in Miami and his recuperation in Alabama and that the DEA did not pursue requests for information concerning the defendant of the District Office in Caracas, Venezuela because the United States did not have an extradition treaty with Venezuela which would enable the Government to utilize more specific information as to the defendant's whereabouts in the latter country.

Special Agent Anderson further testified that informers had advised the DEA that when the defendant came to this country he used false names and documentation and that, in effect, a verification of the shooting incident in Miami would have been impossible to trace without more specific information than was given to them.

## I.

Both sides agree that the Supreme Court has established a four-part balancing test to determine whether a defendant's constitutional right to a speedy trial has been violated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), namely, (i) the length of delay, (ii) the reasons for the delay, (iii) the nature of the defendant's assertion of his right to a speedy trial, and (iv) the prejudice caused to the defendant as a result of the delay (*id.* at 530–33, 92 S.Ct. at 2192–93).

Moreover, both parties agree that the length of the delay in the case of *Barker* (in excess of seven years) is considered "presumptively prejudicial" (*id.* at 530, 92 S.Ct. at 2192).

Such presumption compels us to inquire into the other three factors to determine whether they overcome the same.

## II.

As to the second factor, *i.e.*, the reason for the delay, the Government has a duty under normal circumstances to make a diligent good faith effort to locate and apprehend a defendant and bring him or her to trial. The question is "whether the reason for the delay is because the Government breached that duty." *United States v. Deleon*, 710 F.2d 1218, 1221 (7th Cir. 1983).

Before commencing this analysis we must remember that hindsight is better than contemporaneous or foresight and Monday morning quarterbacking is a favorite sport of armchair strategists and litigating lawyers.

In all fairness, we must examine this question in the light of facts known at the time action or non-action is taken.

The DEA knew that it had a sealed indictment until June 16, 1980; it further knew that defendant's co-conspirator and cousin, Hector Chacon, had been murdered in Texas in 1978; and it also knew that there were contracts out on the lives of all the defendants and that defendant Agreda had traveled to the United States under false names and documents; but it also learned some six months after the event that he had been shot and wounded in Miami, Florida, and that he had gone to Greece to recover in a hospital there. The DEA says it did not know the defendant's correct address or telephone number in Venezuela, nor did it know that he was continuing to make trips under his true name to the United States.

The defendant says now that the DEA "should have" attempted to locate the defendant in Venezuela, that it "should have" realized he was using his true name and continuing to enter the United States, and "should have" alerted the United States Embassy in Venezuela and Customs at key points in this country, and that it "should have" investigated the details of the shooting in Miami.

Viewed objectively, none of these "should haves" makes much sense. If the DEA had located the defendant in Venezuela and advised him of the indictment, they would have made sure of only one thing, namely, that he would never return to this country again. And, as Special Agent Anderson pointed out, there was no legal way that the DEA could have compelled him to return. Secondly, there was no reason for the DEA to believe that the defendant would openly (as distinguished from covertly) return to this country, his cousin and co-defendant having been murdered, con-

tracts being out on the lives of all of the remaining defendants, and he himself having been the target of an apparent attempted murder. Finally, the DEA says it did not have sufficient facts with respect to the six months old reported attempt on defendant's life in Miami to conduct any kind of a meaningful investigation.

■ The best the DEA could hope for, according to the Government, was either a good informant's tip or the break it received when the defendant's name was spotted on the NADDIS check by an alert official at the U.S. Embassy in Venezuela. When this happened, a prompt arrest was thereafter made. Under the circumstances, the Government may not properly be charged with negligence or breach of duty contributing to the delay.

A not dissimilar situation existed in *United States v. Deleon*, 710 F.2d 1218 (7th Cir.1983), wherein the Court of Appeals concluded that "any delay in this case was caused not by the Government's negligence but by Deleon's fugitive status" at 1221, and went on to say in pertinent part:

"With respect to the contention by Deleon that the Government should have found him while he was in the custody of Texas officials or while he was out on bond, we do not agree. Deleon does not allege that the Government received information from Texas officials concerning Deleon's whereabouts. Furthermore, we do not believe that knowledge of Deleon's location by the Texas authorities should be imputed to the federal government. We also do not agree with Deleon regarding his assertion that the Government should have found and apprehended him on one of the occasions when he crossed the U.S.-Mexican border. In light of the fact that thousands of people both legally and illegally cross the border daily, we believe that such a requirement, without some type of reasonable lead, would place too great a burden on the Government."

710 F.2d at 1221.

■ So also in the case at bar, knowledge of the defendant's location by the

Miami and/or Florida authorities should not be imputed to the Federal Government nor is it reasonable to hold that the Government should have found and apprehended the defendant on one of the occasions when he entered Miami absent "some type of reasonable lead." Moreover, as in *Deleon,* there is no allegation in the case at bar that "the Government deliberately delayed in apprehending" the defendant herein.

## III.

The third *Barker* factor, *i.e.,* the nature of the defendant's assertion of his right to a speedy trial, is not relevant or applicable herein.

## IV.

As to the fourth factor, in *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. at 2193, the Supreme Court offered the following guidelines:

"A fourth factor is prejudice to the defendant. Prejudice, of course, should be asserted in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."

and thereafter elaborated on these guidelines as follows:

"The Sixth Amendment right *to* a speedy trial ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."

*United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982).

■ In the case at bar there was virtually no prejudice to the defendant under the foregoing guidelines; there was no pretrial incarceration between the date of the indictment and the date of defendant's arrest; the defendant was not burdened with any anxiety and concern because he claims he did not have any knowledge of the existence of the pending indictment and no evidence was introduced at the hearing that would indicate that any defense available to the defendant might have been impaired by virtue of the lapse of time. Indeed, a substantial portion of the Government's case appears to be based upon taped conversations of the defendant and these tapes, of course, are being made available to the defendant at this time.

■ Based on all of the foregoing, after balancing the four factors listed in *Barker v. Wingo,* we believe that there has been no denial of defendant's constitutional right to a speedy trial.

### Rule 48(b) Motion

■ Defendant also claims that because of the more than seven years delay we should dismiss the indictment under Federal Rule of Criminal Procedure 48(b). However, as stated by the United States Supreme Court in *United States v. Marion,* 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971), Rule 48(b) "clearly is limited to post-arrest situations." *See also United States v. Deleon,* 710 F.2d at 1223.

For the foregoing reasons, defendant's motion to dismiss the indictment must be and the same hereby is denied.

SO ORDERED.