**UNITED STATES OF AMERICA**

**v.**

**Jonathan LEAVER, Defendant.**

**No. 98 CR.731(SAS).**

United States District Court,
S.D. New York.

Dec. 13, 2004.

John J. Tigue, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, New York, for Defendant.

Robin W. Morey, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York, New York, for the Government.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

On July 23, 2004, Jonathan Leaver was arrested while on a layover in Hawaii. Leaver is charged in a four-count indictment with mail fraud, wire fraud, and bank fraud, in violation of 18 U.S.C. §§ 1341, 1342 and 1344. The charges in the indictment arise out of events that are alleged to have taken place in 1993. Leaver now moves to dismiss the indictment on the grounds that the government has violated his Sixth Amendment right to a speedy trial and his Fifth Amendment due process rights, and that the statute of limitations has expired.

## II. BACKGROUND [1]

Leaver's arrest stemmed from a sealed indictment returned on July 15, 1998. The indictment alleges that, in July 1993, Leaver falsely claimed that a painting by Alberto Giacommetti, "Portrait of the Artist's Wife," which Leaver owned and had insured through the Royal Insurance Company ("Royal Insurance") with an appraised value of $1.2 million, and in which Leaver had assigned a security interest to Standard Chartered Bank ("the Bank"), had been stolen. Leaver denies these allegations, and maintains that the painting

---

1. The following facts are drawn from the parties' affidavits and supporting exhibits. Unless otherwise noted, these facts are undisputed.

was stolen from the trunk of his car on July 26, 1993.[2]

### A. Leaver's Conduct Following the Alleged Crime

Leaver is a fifty-eight year old British citizen and resident of France.[3] At the time of the alleged fraud, Leaver had lived in Manhattan as a permanent resident and green card holder for over fifteen years.[4] Leaver has never possessed a United States passport.[5]

In November 1993, the Bank sued Leaver in the Supreme Court of New York County on claims arising out of the alleged fraud.[6] Soon after, in early 1994, Leaver moved back to London, and voluntarily relinquished his green card.[7] After Leaver's return to England, on June 1994, a civil warrant was issued for his arrest after he failed to attend court proceedings in New York.[8] In February 1995, Leaver filed for bankruptcy in London. He was discharged from bankruptcy in 1999.[9] In July 2000, the litigation with the Bank was settled, and the arrest warrant was vacated.[10]

There is no evidence that Leaver ever knew about the FBI's investigation, or his eventual indictment. However, it is clear that Leaver was aware of the possibility that he was under criminal investigation by United States authorities. In November 1994, Leaver's London residence was searched by the London Metropolitan Police, on a warrant issued on the basis of the affidavit of Gary Oldman. In an affidavit signed on June 2, 1995, Leaver speculated that Oldman was from the New York City Police Department ("NYPD"). In fact, Leaver was wrong—Oldman was a British policeman [11]—but the possibility of criminal prosecution was clearly in his mind.

Leaver lived in London from 1994 to 1999. Leaver moved twice, to different residences in London, keeping the same telephone and fax numbers and filing a change of address notice with the Post Office.[12] During this time, Leaver lived openly, under his own name, with his partner, Karen Wright. Leaver's telephone was in Wright's name, and his first apartment was rented in Wright's name; Leaver explains that this is because Wright moved to London before him to locate a new apartment, while he concluded his affairs in New York.[13] Leaver points, however, to a number of signs of the open nature of his residence: for instance, Leaver applied for a British driver's license in his

---

2. *See* September 24, 2004 Affirmation of Jonathan Leaver ("Sept. 24 Leaver Aff.") ¶¶ 22–23.

3. *See id.* ¶ 2.

4. *See id.* ¶ 4.

5. *See* November 23, 2004 Affirmation of Jonathan Leaver ("Nov. 23 Leaver Aff.") ¶ 16.

6. *See* Sept. 24 Leaver Aff. ¶ 14.

7. *See id.* ¶ 5.

8. *See id.* ¶ 14.

9. *See* Nov. 23 Leaver Aff. ¶ 12.

10. *See* Sept. 24 Leaver Aff. ¶ 15.

11. *See* November 1, 2004 Affirmation of Jonathan Leaver ("Nov. 1 Leaver Aff.") ¶ 3.

12. *See id.* ¶ 6. The first of these moves, in late 1995 or early 1996, was between two apartments in the same complex, from 37 Chesham Place, Flat 7, to 34 Chesham Place, Flat 1. *See id.* In late 1997, Leaver moved to 44 Lowndes Square, only 200 yards from Chesham Place. *See* Nov. 23 Leaver Aff. ¶ 3.

13. *See* Nov. 1 Leaver Aff. ¶ 5. It is not clear from the record whether Leaver and Wright's subsequent apartments were also in her name.

own name.[14] Leaver habitually used an American Express card, issued in the United States and listed under his social security number and name, and charged to his address.[15] In approximately 1995 or 1996, Leaver's British passport was renewed and the new passport was mailed to his home address.[16] Leaver was aware of the civil arrest warrant, but made no effort to conceal his address from his adversaries or the court; in 1995, Leaver submitted a motion to vacate the arrest warrant which listed his London address.[17]

At some point in 1999, Leaver moved to Opio, France, where he currently resides with Wright.[18] On moving to France, Leaver submitted a change of address form to the Post Office, and his mail was forwarded to him in Opio.[19] Leaver also submitted a change of address form to American Express, and continued to use his American Express card in France.[20]

As in London, Leaver's telephone is in Wright's name, and their house is rented in her name; Leaver explains that this is because of his 1995 bankruptcy and his poor credit rating.[21] However, Leaver purchased, rented and insured a car in his own name; he maintained a bank account with Banque National de Paris in his own name; and he maintained a health insurance policy in his own name with International Health Insurance Denmark.[22] Leaver was treated in a hospital in Nice under his name; he provided the hospital with his home address and filed an insurance claim for the treatment.[23] He was involved in an automobile accident in 2000, and gave his name and home address to the French police.[24] His bankruptcy trustee knew of his address in France.[25] His associates report that he is widely known in Opio under his own name.[26]

The Government contends that Leaver was not living openly in France. In support of this argument, the FBI points out that, when Leaver was arrested, he was not carrying any identification reflecting his French residency, but was traveling on a British passport (and carrying, in addi-

14. *See* Sept. 24 Leaver Aff. ¶ 7.

15. *See id.* ¶ 8.

16. *See id.* ¶ 12.

17. *See id.* ¶ 14. *See also* Nov. 23 Leaver Aff. ¶ 2.

18. *See* Sept. 24 Leaver Aff. ¶ 10. The Government argues that Leaver moved to France in 1998, and not, as Leaver claims, in the first quarter of 1999. The Government's basis for this argument is the fact that, following his arrest, Leaver informed pretrial services in Hawaii that he had "resided ... in France for the past six years with his girlfriend, Karen Wright." Government's Memorandum of Law in Opposition to Motion to Dismiss ("Gov't Mem.") at 15 (quoting Pretrial Services Report, Ex. C to Leaver's Memorandum of Law in Support of Motion to Grant Bail). If Leaver had been living in France for six years at the time of his arrest in July 2004, he must have moved there in mid–1998. In light of Leaver's specific and detailed recollections

as to the timing of his move to France, *see* Nov. 23 Leaver Aff. ¶ 5, I find that Leaver moved to France in the first quarter of 1999. It is not surprising that Leaver gave a rough estimate of the timing of his move to Pretrial Services, rather than a specific date, at a time of shock following his arrest.

19. *See* Sept. 24 Leaver Aff. ¶ 11.

20. *See id.*

21. *See* Nov. 1 Leaver Aff. ¶ 7.

22. *See* Sept. 24 Leaver Aff. ¶ 11.

23. *See* Nov. 1 Leaver Aff. ¶ 9.

24. *See id.*

25. *See* Nov. 23 Leaver Aff. ¶ 12.

26. *See* Affirmation of William Hare, Leaver's friend and associate, in Support of Leaver's Motion to Dismiss ¶¶ 4, 5.

tion, a valid Dominican passport).[27] The FBI also points out that Leaver was using a British driver's license, which stated that he lived in London.[28]

The fact that Leaver retained his British driver's license and never acquired a French passport is not sufficient evidence that he was concealing his French residency. I also note that the FBI concedes that even at the time of his arrest, Leaver was carrying airline upgrade coupons which gave his name and address in Opio, and an invoice for art purchased in Australia which gave his French phone number.[29]

Finally, over the past eleven years, Leaver has traveled frequently on business, although not to the United States. On these business trips, Leaver traveled under his British passport, and purchased tickets and rented hotels rooms and cars under his own name.[30] Between 2000 and 2002, Leaver made over sixty airline reservations in his own name, with airlines including Delta and United Airlines, and paid with his American Express card.[31]

## B. The Government's Pre–Indictment Investigation

In 1993, the Insurance Company made a fraud referral to the FBI regarding Leaver's claim that the painting had been stolen.[32] The FBI appears to have taken no action to investigate this allegation until July 1994, when the Bank informed the FBI that Leaver had failed to appear at a discovery hearing in connection with the New York Supreme Court civil proceedings.[33] The Bank informed the FBI that an arrest warrant had been issued for Leaver. The Bank also informed the FBI that Leaver was in London, suggested that Leaver might be living with Wright, and gave them Wright's London address at 37 Chesham Place.[34]

In January 1995, the FBI ran Leaver's name through NADDIS, a DEA database, and through the Treasury Enforcement Communications System, without success. The FBI also checked the INS database, and found two Jonathan Leavers; a United States citizen, and a British citizen.[35] This seems to have created a lasting confusion about Leaver's citizenship, hampering the FBI's investigation for the next few years. The FBI in New York sent a request to the FBI in Washington, requesting Leaver's INS file and clarification on his citizenship.[36] The FBI also obtained a consumer credit report for Leaver, which listed his former address in New York.[37] On March 1995, the FBI learned from the INS that Leaver was a British citizen, and learned his passport number.[38] However, the FBI continued to investigate the question of Leaver's citizenship.

In March 1995, the FBI in New York requested that the FBI Legal Attache in London ("FBI Legat") conduct an investigation of Leaver, including interviewing

**27.** *See* Affirmation of Johanna M. Loonie, Special Agent, FBI, ("Loonie Aff.") ¶ 3. Loonie is the case agent currently assigned to the Leaver investigation. *See id.* ¶ 1.

**28.** *See id.* ¶ 54.

**29.** *See id.* ¶ 57.

**30.** *See* Sept. 24 Leaver Aff. ¶ 13.

**31.** *See* Nov. 23 Leaver Aff. ¶¶ 13–15.

**32.** *See* Loonie Aff. ¶ 3.

**33.** *See id.* ¶ 4.

**34.** *See id.* ¶ 5.

**35.** *See id.* ¶¶ 6–7.

**36.** *See id.* ¶ 9.

**37.** *See id.* ¶ 14.

**38.** *See id.* ¶ 16.

Wright, whose address at 37 Chesham Place was known to the FBI.[39] There is no indication that this interview ever took place. The New York FBI also requested that the FBI Legat contact the British authorities to determine Leaver's citizenship.[40]

In June 1995, the FBI case agent discussed the possibility of extraditing Leaver with an Assistant United States Attorney ("AUSA"). The FBI was informed that "a determination of Leaver's citizenship and whether he holds a valid British passport" was necessary to determine if extradition was an option.[41] The FBI continued to investigate Leaver's whereabouts and citizenship.

In July 1995, the Insurance Company provided the FBI with its files on Leaver, in response to a grand jury subpoena.[42] These files included several interviews with Leaver, which, among other things, contained the information that Leaver was a British citizen.[43] In August 1995, the FBI Legat informed the New York FBI "that Leaver was allegedly living at Flat 1 34 or 35 Chesam [sic] Place London."[44] In April 1996, the Metropolitan Police, in response to a late 1995 or early 1996 request from the FBI, informed the FBI that Leaver was in London.[45]

In April 1996, the FBI case agent again discussed the possibility of extraditing Leaver. The AUSA "explained that, in order to extradite Leaver, affidavits needed to be taken from all witnesses that were planned to be called for a potential trial of Leaver."[46] The FBI therefore began "the process of preparing a summary of the information necessary from each witness."[47]

At this point, there is an unexplained two-year gap in the FBI's investigation. The investigation then resumed in July 1998, when the FBI "learned of a cooperating witness from another matter who had information pertaining to Leaver."[48] The FBI interviewed the witness, who "provided the first direct evidence the FBI had regarding the disposition of the Giacometti Painting."[49] The next week, on July 15, 1998, the FBI caused the indictment to be returned, and sealed. A federal arrest warrant was issued.

## C. The Government's Post–Indictment Conduct

On July 17, 1998, two days after the indictment was returned, the FBI entered the federal arrest warrant into the National Crime Information Center database.[50] On October 21, 1998, the New York FBI sent a copy of the federal arrest warrant to the FBI Legat requesting assistance in locating Leaver's whereabouts, "so that a determination can be made regarding the feasibility of extradition."[51] Apparently the confusion as to Leaver's citizenship was still not resolved, because the New

---

39. *See id.*

40. *See id.*

41. *See id.* ¶ 18.

42. *See id.* ¶ 21.

43. *See* Royal Insurance Company Interviews, Exs. A–D to November 23, 2004 Affidavit of John J. Tigue, defendant's counsel ("Tigue Aff.").

44. Loonie Aff. ¶ 22.

45. *See id.* ¶¶ 25–27.

46. *Id.* ¶ 28.

47. *Id.* ¶ 29.

48. *Id.* ¶ 31.

49. *Id.* ¶ 32.

50. *See id.* ¶ 34.

51. *Id.* ¶ 36.

York FBI informed the FBI Legat that "it was possible that he had two U.S. passports," and did not inform the FBI Legat that Leaver was a British citizen.[52] Nor, it appears, was the FBI Legat informed of Leaver's connection to Wright, of whose address and phone number the New York FBI was aware. On December 21, 1998, the FBI Legat responded that the London police were unable to locate Leaver without additional information about which passport he was using.[53] The New York FBI responded that it was unable to provide any additional information.[54] The FBI Legat informed the New York FBI that "[t]he Metropolitan Police Department, Fraud Squad, have exhausted all attempts to locate Jonathan Leaver, to no avail. If New York obtains additional information pertaining to Leaver which would benefit London, same will be forwarded to the Metropolitan Police."[55]

No such additional information was ever provided. Instead, the FBI "attempted to determine if Leaver had returned to the United States."[56] In March 1999, the FBI ran a database search which showed that border crossing records did not record Leaver's return to the United States.[57] In May 1999, the FBI had the federal arrest warrant entered into the Immigration and Naturalization "Look–Out" database.[58] In January 2000, the FBI conducted searches for Leaver in various databases, including a criminal history check and a DMV check, none of which provided any useful information.[59] In August 2000, the FBI ran a ChoicePoint database search for Leaver, "attempting to determine if private businesses (or state and local government agencies) had a new address or any new information on Leaver."[60] The ChoicePoint search only identified Leaver's old New York addresses.[61]

Faced with this impasse, the FBI appears to have given up. The record shows no further action of any kind by the FBI, except in July 2002, when the information relating to Leaver in the Immigration and Naturalization "Look–Out" database was updated.[62] The Government indicates that the FBI essentially abandoned its efforts to search for Leaver, hoping instead that he would pass through United States customs and so fall into their hands.[63] This did not happen until July 22, 2004, when the United States Customs and Border Patrol contacted the FBI case agent and informed her that Leaver was on a flight scheduled to land shortly in Hawaii.[64] Leaver was promptly arrested. The indictment was unsealed on the same day.

## III. APPLICABLE LAW

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused

52. *See id.* ¶ 36.

53. *See id.* ¶ 38.

54. *See id.*

55. *Id.* ¶ 39.

56. *Id.* ¶ 40.

57. *See id.*

58. *See id.* ¶ 42.

59. *See id.* ¶¶ 44–45.

60. *Id.* ¶ 47.

61. *See id.* ¶ 48.

62. *See id.* ¶ 49.

63. *See id.* ¶ 50 ("Finally, with the advent of extensive post-September 11th security measures implemented across the United States, including the prescreening of all passengers entering the United States ... the FBI placed greater confidence in the entry of the arrest warrants in the NCIC system to apprehend fugitives, including Leaver.").

64. *See id.* ¶ 51.

shall enjoy the right to a speedy and public trial ..." [65] "The right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, 'We will sell to no man, we will not deny or defer to any man either justice or right.' " [66]

■ A court faced with an alleged violation of the right to a speedy trial must first determine whether the length of the delay between accusation and trial is "presumptively prejudicial." [67] The Second Circuit has noted that there is a "general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not." [68]

■ If the delay meets the "presumptively prejudicial" standard, courts consider four factors to determine whether the defendant's Sixth Amendment right to a speedy trial has been violated: (1) whether the delay before trial was "uncommonly long"; [69] (2) whether the Government or the defendant is "more to blame for the delay"; (3) whether the defendant asserted his right to a speedy trial "in due course"; and (4) whether the defendant "suffered prejudice" as a result of the delay. [70] "These factors have no 'talismanic qualities,' and none is 'either a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial.' Rather, they are 'related factors' that 'must be considered together with such other circumstances as may be relevant.' " [71]

■ With respect to the first factor, there is no clear definition for an "uncommonly long" delay, and courts consider the complexity of the crime in making this determination. "The delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." [72] However, the Supreme Court has found delays of six years in a murder case, and eight years in a prosecution for conspiracy to import co-

---

**65.** U.S. Const. amend. VI.

**66.** *Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (quoting Magna Carta, c. 29 (c. 40 of King John's Charter of 1215) (1225), translated and quoted in Coke, The Second Part of the Institutes of the Laws of England 45 (Brooke, 5th ed., 1797)).

**67.** *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**68.** *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir.1992) (citing Gregory P.N. Joseph, Speedy Trial Rights in Application, 48 Fordham L.Rev. 611, 623 n. 71 (1980)).

**69.** This factor is often merged with the initial inquiry regarding whether the length of the delay warrants judicial review because if the accused demonstrates that the delay was presumptively prejudicial, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). *See also United States v. Solomon*, No. 95 Cr. 154, 1996 WL 399814, at *4 (S.D.N.Y. July 16, 1996) (concluding that a twenty-month delay between indictment and arrest is sufficient to trigger judicial review because it is presumptively prejudicial, but is not uncommonly long).

**70.** *Doggett*, 505 U.S. at 651, 112 S.Ct. 2686 (citing *Barker*, 407 U.S. at 530, 92 S.Ct. 2182). *See also United States v. Ostroff*, 340 F.Supp.2d 362, 366–68 (S.D.N.Y.2004).

**71.** *Flowers v. Warden*, 853 F.2d 131, 133 (2d Cir.1988) (citation omitted) (quoting *Barker*, 407 U.S. at 533, 92 S.Ct. 2182).

**72.** *Barker*, 407 U.S. at 531, 92 S.Ct. 2182.

caine, to be "extraordinary."[73]

■ The second factor requires the court to determine whether the Government is more to blame for the delay than the defendant. Where the Government intentionally delays in order to gain an advantage at trial, this factor weighs heavily against the Government.[74] However, even where the delay is caused by the Government's mere negligence, this factor must still weigh against the Government, albeit less heavily, because the Government bears "ultimate responsibility."[75] The Government has a " 'constitutional duty to make a diligent good faith effort' to bring [an accused] to trial without unnecessary delay."[76] This duty does not end because an accused is outside the United States; in such a case, the Government has a duty to seek extradition, unless such an effort would be futile.[77]

■ The defendant's assertion of his right to a speedy trial, the third factor, appears to be most relevant in the context of a habeas petition based on the denial of the defendant's right to a speedy trial, where that right was not raised in trial court, or was raised late.[78] Nonetheless, this factor must be considered in all speedy trial inquiries. Notably, where the defendant is unaware of the indictment, he cannot "be taxed for invoking his speedy trial right only after his arrest."[79]

■ The fourth factor, prejudice to the defendant,

> should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, *the most serious is the last,* because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. *If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if witnesses are unable to recall accurately events of the distant past.* Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.[80]

■ The determination of whether the defendant has been prejudiced is related to the length of the delay, and the reason for that delay. Because "time's erosion of exculpatory evidence and testimony 'can rarely be shown,' " prejudice is presumed where there is a "prolonged and unjustifiable delay . . . in prosecution."[81]

---

73. *See id.* at 533, 92 S.Ct. 2182 (murder); *Doggett,* 505 U.S. at 652, 112 S.Ct. 2686 (conspiracy to import cocaine).

74. *See Barker,* 407 U.S. at 533, 92 S.Ct. 2182.

75. *Id.*

76. *United States v. Diacolios,* 837 F.2d 79, 82 (2d Cir.1988) (quoting *Smith v. Hooey,* 393 U.S. 374, 383, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969)).

77. *See United States v. Blanco,* 861 F.2d 773 (2d Cir.1988); *United States v. Pomeroy,* 822 F.2d 718 (8th Cir.1987); *United States v. Walton,* 814 F.2d 376 (7th Cir.1987).

78. *See Barker,* 407 U.S. at 524–30, 92 S.Ct. 2182 (discussing and rejecting a trend among the circuit courts requiring a defendant to "demand or waive" the right to a speedy trial).

79. *Doggett,* 505 U.S. at 654, 112 S.Ct. 2686.

80. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182 (emphases added). *See also Doggett,* 505 U.S. at 654, 112 S.Ct. 2686.

81. *Doggett,* 505 U.S. at 655, 112 S.Ct. 2686.

In such a case, "affirmative proof of particularized prejudice is not essential." [82] Delay caused by the Government's negligence is not as prejudicial as intentional delay, but "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." [83] Moreover, "[t]he weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows." [84] "[T]o warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." [85] Where the defendant asserts prejudice, either general or particularized, as a result of a delay, the Government has an affirmative burden to rebut that claim. [86]

## IV. DISCUSSION

### A. The Statute Of Limitations Has Not Run

■ An indictment for a violation of 18 U.S.C. §§ 1341 or 1343 (mail or wire fraud) must be returned within five years of the commission of the offense. [87] An indictment for a violation of 18 U.S.C. § 1344 (bank fraud) must be returned within ten years of the commission of the offense. [88] An indictment timely filed and properly sealed is considered returned when the indictment is sealed, even if the indictment is unsealed after the expiration of the limitations period. [89]

■ The Government asserts that the indictment was sealed to facilitate Leaver's arrest. [90] Facilitation of arrest, where the accused's whereabouts are unknown, is a proper purpose for sealing, as is the fear that an accused will become a fugitive if he learns of the charges. [91] It is clear that the Government never learned of Leaver's whereabouts during the period in which the indictment was sealed [92] (although this was partly due to its own lack of diligence); and, although I find that Leaver was living openly in England and France, the Government certainly had a good faith belief that he might conceal himself if he learned of the indictment. It was therefore entirely proper for the Government to seal the indictment, and keep it sealed, to facilitate Leaver's arrest. Accordingly, the statute of limitations has not run.

### B. The Sixth Amendment Requires Dismissal of the Indictment

#### 1. The Sixth Amendment Attaches While an Indictment Is Sealed

The Government argues that Leaver's Sixth Amendment right to a speedy trial

82. *Id.*

83. *Id.* at 657, 112 S.Ct. 2686.

84. *Id.*

85. *Id.*

86. *See id.* at 658, 112 S.Ct. 2686.

87. *See* 18 U.S.C. § 3282(a).

88. *See* 18 U.S.C. § 3293(1).

89. *See United States v. Deglomini,* 111 F.Supp.2d 198, 200 (E.D.N.Y.2000).

90. *See* Government's Memorandum of Law in Opposition to Motion to Dismiss at 35. Leaver does not offer any alternative explanation for why the Government would have sealed the indictment. Under the circumstances, the Government's motive is clear.

91. *See United States v. Srulowitz,* 819 F.2d 37, 40 (2d Cir.1987); *United States v. Slochowsky,* 575 F.Supp. 1562, 1569 (E.D.N.Y.1983).

92. While the Government may have been aware of Leaver's addresses at Chesham Place during the period of his residency there, prior to the indictment, it does not appear that the Government ever learned of Leaver's addresses at Lowndes Square or in Opio.

right did not attach while the indictment was sealed. The indictment was sealed throughout the relevant period, and was not unsealed until the day of Leaver's arrest. The Government argues that the *Barker/Doggett* analysis is therefore irrelevant, and that the entire eleven-year period between the alleged crime and Leaver's arrest must be analyzed under the Due Process standard articulated in *United States v. Marion.*[93]

The Government relies on the 1979 case of *United States v. Watson,*[94] in which the Second Circuit held that "the speedy trial right under the Sixth Amendment attaches not when a sealed indictment is filed but when it is unsealed (or when the Government arrests the defendant or otherwise apprises him of the charges against him)."[95] Therefore, the court concluded, "[i]n order to challenge the delay between the sealing and unsealing of the indictment, the defendant must look either to the Due Process Clause or to the statute of limitation itself and whatever implicit restrictions that it imposes upon the Government's power to toll the limitations period by sealing the indictment."[96]

The Government's reliance on *Watson* is misplaced because *Watson* is no longer good law. First, I note that *Watson*'s holding has not been reflected in the subsequent practice of this Circuit. Since *Watson* was decided, the Second Circuit and district courts located therein have addressed the merits of Sixth Amendment speedy trial claims based on the delay between the filing of a sealed indictment and the defendant's arrest—albeit without explicitly noting the conflict with *Watson,* and in cases in which no Sixth Amendment violation was found despite the court's consideration.[97] The Second Circuit has never reaffirmed the holding of *Watson;* instead it has stated that the Sixth Amendment attaches "whenever an individual has been *officially accused* of a crime," without noting *Watson*'s limitation on that rule.[98]

More importantly, the rationale underlying *Watson* has been undermined by the Supreme Court's subsequent decision in *Doggett.* The *Watson* court explicitly based its holding on the view that " 'the major evils protected against by the speedy trial guarantee' [are] public obloquy and anxiety to the accused.' "[99] Because neither the defendant nor the public is aware of a sealed indictment, those 'evils' are not implicated while an indictment remains sealed. Therefore, the court concluded, the speedy trial guarantee does not attach until the indictment is unsealed, or the defendant is arrested or otherwise ap-

93. 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The *Marion* standard, applicable to pre-indictment delay, is far less favorable to defendants than *Barker.* Under *Marion,* the defendant must affirmatively show that the delay "caused substantial prejudice" *and* must show that "the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324, 92 S.Ct. 455. Because the Government's delay was not an intentional device to gain a tactical advantage, Leaver could not prevail under this standard.

94. 599 F.2d 1149 (2d Cir.), *on reh'g replaced,* 690 F.2d 15 (1979), *modified, en banc, sub*

*nom. United States v. Muse,* 633 F.2d 1041 (1980).

95. *Id.* at 1156.

96. *Id.* at 1156, n. 5.

97. *See United States v. Koskotas,* 888 F.2d 254 (2d Cir.1989); *United States v. Agreda,* 612 F.Supp. 153, 157–59 (E.D.N.Y.1985).

98. *Rayborn v. Scully,* 858 F.2d 84, 90 (2d Cir.1988) (emphasis added).

99. *Watson,* 599 F.2d at 1157 n. 5 (quoting *Marion,* 404 U.S. at 320, 92 S.Ct. 455).

prised of the charges against him.[100]

In *Doggett*, the defendant was "blissfully unaware" of the indictment against him until he was arrested, although the indictment was not sealed.[101] The Government and the dissenters on the Court argued that the speedy trial guarantee therefore did not apply, because the defendant was not subject to the " 'major evils' against which the Speedy Trial Clause is directed," specifically " 'undue and oppressive incarceration' and the 'anxiety and concern accompanying public accusation.' "[102]

The majority rejected this argument, holding that the speedy trial right is triggered by "arrest, indictment, or other official accusation" even if the defendant is unaware of the accusation.[103] The majority based its holding on the ground that:

unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence. *Of these forms of prejudice, 'the most serious is the last,* because the inability of a

defendant adequately to prepare his case skews the fairness of the entire system.'[104]

*Doggett* thus explicitly denies the underlying premise of *Watson*, that the "major evils" against which the Sixth Amendment protects are anxiety to the accused and public obloquy. Instead, *Doggett* makes it clear that the major purpose of the Sixth Amendment is to protect against the impairment of the accused's defense. Whether the indictment is sealed or not makes no difference to this concern: witnesses are no less likely to die, nor their memories to dim, because an indictment has been sealed. As Justice Thomas noted in dissent, the majority's holding and rationale is entirely incompatible with *Watson*.[105]

■ *Watson* is thus incompatible with the subsequent practice of this Circuit, and with more recent Supreme Court authority.[106] I therefore conclude that *Watson* is no longer controlling authority, and that the Sixth Amendment speedy trial guarantee attaches when an indictment is filed, regardless of whether it is sealed.

---

**100.** *See id.* at 1156.

**101.** *Doggett*, 505 U.S. at 660, 112 S.Ct. 2686 (Thomas, J., dissenting).

**102.** *Id.* (quoting *Marion*, 404 U.S. at 320, 92 S.Ct. 455). *See id.* at 661, 112 S.Ct. 2686 (Thomas, J., dissenting) ("Even though a defendant may be prejudiced by a pretrial delay, and even though the government may be unable to provide a valid justification for that delay, the Clause does not come into play unless the delay impairs the defendant's liberty.").

**103.** *Id.* at 655, 112 S.Ct. 2686.

**104.** *Id.* at 654, 112 S.Ct. 2686 (emphasis added; quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182; other quotations omitted).

**105.** *Id.* at 665, 112 S.Ct. 2686 (Thomas, J., dissenting).

**106.** I note also that the post-*Doggett* caselaw of other Circuits reflects this evolution in speedy trial jurisprudence. *Compare* the post-*Doggett* cases of *United States v. Casas*, 356 F.3d 104 (1st Cir.2004) (rejecting the Government's argument that the speedy trial guarantee does not attach while an indictment is sealed), *United States v. Bergfeld*, 280 F.3d 486 (5th Cir.2002) (applying speedy trial analysis to period in which indictment was sealed), *and United States v. Hayes*, 40 F.3d 362, 365 (11th Cir.1994) (same) *with* the pre-*Doggett* cases of *United States v. Lewis*, 907 F.2d 773 (8th Cir.1990) (holding that speedy trial rights do not attach while an indictment is sealed) and *United States v. Hay*, 527 F.2d 990 (10th Cir.1975) (same).

## 2. The Delay Was Presumptively Prejudicial

█ The post-indictment delay in this case is six years. There can be no question that such a delay is presumptively prejudicial.[107] It is therefore necessary to consider the four *Doggett* factors.

## 3. The Delay Was Uncommonly Long

█ The six-year delay in this case also clearly meets the "uncommonly long" standard. Leaver's alleged crime is not especially complex; it appears that the Government's investigation was complete by 1998. The Government does not allege that Leaver had any co-conspirators whom it needed to question or arrest. It is particularly clear that the delay was uncommonly long in light of the five years that had already elapsed between the alleged crime and the indictment.[108]

## 4. The Government Was Primarily to Blame for the Delay

█ The Government maintains that Leaver is responsible for the delay. The Government argues that Leaver fled the United States for London in 1994, and has been concealing himself since, while the government—so it contends—diligently investigated and pursued him. The Government's argument is unavailing.

There is no evidence that Leaver concealed himself in London or Opio. Leaver was undoubtedly aware of the civil arrest warrant. Although he left the United States before the warrant was issued, it is likely that he remained outside the United States to avoid arrest on that warrant, at least until 2000, when it was vacated. It is also clear that Leaver was conscious of the possibility that he was being investigated criminally, at least in the first few years after the alleged fraud, although there is no evidence that he was aware of the indictment. Nonetheless, I am not persuaded that he made efforts to conceal himself.

As discussed above, the overwhelming weight of the evidence is that Leaver lived openly, making no unusual effort to avoid giving his name and address to businesses or governmental authorities. Leaver has offered convincing explanations for the fact that his London and Opio telephone and apartments were in Wright's name—a fact which is not, in any case, all that remarkable or suspicious. I have already said that I do not find Leaver's failure to acquire a French passport or (superfluous) French driving license significant, in light of the considerable evidence of the open nature of Leaver's residency. Finally, I cannot, as the Government urges, infer that Leaver was concealing himself from the fact that the Government was unable to locate him, given the less than diligent nature of the Government's investigation.[109]

---

107. *See Vassell,* 970 F.2d at 1164 (stating that there is a general consensus that a delay of over eight months is presumptively prejudicial).

108. *See Watson,* 599 F.2d at 1157 ("preindictment delay may have some relevance to the analysis of the speedy trial right.") (quotation marks omitted); *United States v. Vispi,* 545 F.2d 328, 333 (2d Cir.1976) ("It is relevant that the 20–month [post-indictment] period was immediately preceded by a period of approximately 4 to 5 years between the govern-ment's discovery of the alleged offense and its filing of the information.").

109. Moreover, even if Leaver were attempting to conceal himself, the Government still had a duty to pursue him with "due diligence." *Rayborn v. Scully,* 858 F.2d at 90 ("[W]henever an individual has been officially accused of a crime, not only is the government charged with the burden of bringing the accused swiftly to trial, but it is under an obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution."). Of

■■■■ I conclude instead that the Government bears the bulk of the blame for the delay. Of course, "[b]efore commencing this analysis we must remember that hindsight is better than contemporaneous or foresight and Monday morning quarterbacking is a favorite sport of armchair strategists and litigating lawyers." [110] I am mindful that because Leaver was outside the United States, even though he was not concealing himself, the investigative options available to the Government were somewhat limited. Finally, I recognize that the Government is not required to make "futile" efforts in pursuit of an accused.[111]

Even taking these considerations into account, I conclude that the Government's investigation of Leaver fell short of the diligence required by the Sixth Amendment—especially given that five years had already elapsed before the indictment was returned, and the Government therefore faced a heightened burden of urgency.[112] Had the Government pursued Leaver with proper diligence, it could have located him and begun extradition proceedings years ago.

In the first few months following the return of the indictment in 1998, the Government was unable to locate Leaver in London, although it was aware of his previous London address. The Government seems to have relied entirely on Scotland Yard to find Leaver. Unfortunately, the Government did not provide Scotland Yard with all the information about Leaver in its possession. The Government gave Scotland Yard incomplete and misleading information about Leaver's citizenship, and failed to inform Scotland Yard about the known whereabouts of Leaver's associates, for instance Wright, and his business associate, Ivor Braka.

It was not, of course, unreasonable for the Government to rely on the British authorities to some extent.[113] The Government's initial failure to provide Scotland Yard with all the information in its possession may also have been excusable. It was not, however, excusable that the Government never followed through when it was notified that Scotland Yard was unable to locate Leaver, and was invited to provide Scotland Yard with additional information. Given the failure of the Government to provide Scotland Yard with adequate assistance and information, and its lack of follow-through, its reliance on Scotland Yard was not reasonable or in good faith.[114]

The same lack of even minimal follow-through marks the rest of the Government's desultory investigation. For example, the unsuccessful ChoicePoint search in 2000 was never repeated in the next four years.[115] The Government never—as it

---

course, if Leaver were concealing himself, he would bear some of the responsibility for the delay, and it might justify the Government's failure to find him. *See id.*

**110.** *United States v. Agreda,* 612 F.Supp. at 158.

**111.** *United States v. Diacolios,* 837 F.2d at 83 (holding that, where the accused is a fugitive, the Government is not required to make "futile" efforts to find him).

**112.** *See* cases cited *supra* n. 102.

**113.** *See Rayborn,* 858 F.2d at 90 ("[A] state is perfectly entitled to rely in good faith upon the efforts of another jurisdiction when a suspect for whom an arrest warrant has been issued evades arrest in the first state and absconds to that other jurisdiction.").

**114.** *See id.* (holding that reliance on another jurisdiction's investigative efforts is permitted "if reasonable and grounded in the belief that the helping jurisdiction is in fact conducting a proper investigation.").

**115.** ChoicePoint, as the Government describes it, "pieces together vast swaths of data into a chronological picture of someone's life. As you move through life, you leave traces of

did in *Doggett*—interviewed Leaver's known relatives or associates. The Government never ran a credit check on Leaver's American Express card, although it was aware of Leaver's use of the card and its number.[116] Such a search might have revealed the defendant's billing address (as a similar search belatedly did in *Doggett*). The Government knew that Leaver had filed a motion to vacate his civil arrest warrant, but never asked for a copy of the papers, although Leaver's affidavit in support of that motion contained information about Leaver's whereabouts and contacts.[117]

The Government's investigation was desultory before 2000, but after 2000 it ground to a complete halt. All active efforts to locate Leaver ceased, and the Government sat back and waited passively for Leaver to turn up.

The facts of this case resemble *Doggett*. There, the Government attempted to locate the accused by entering his name into various databases and interviewing his parents. The Government learned that Doggett was in Panama. No extradition request was filed. The following year, Doggett returned to the United States, but the Government did not notice his return. Apparently assuming that Doggett could not be found, the Government gave up: for the next six years the Government "made no effort ... to track Doggett down, either abroad or in the United States."[118] "Thus Doggett remained lost to the American criminal justice system until September 1988, when the Marshal's Service ran a simple credit check on several thousand people subject to outstanding arrest warrants and, within minutes, found out where Doggett lived and worked."[119] The Supreme Court concluded that the Government's "lethargy" in pursuing Doggett constituted "findable negligence."[120]

I reach the same conclusion with respect to Leaver. In the six years between Leaver's indictment and arrest—six years that followed an already unusual five-year pre-indictment delay—the Government made little effort to find Leaver. Perhaps, given Leaver's "relative unimportance,"[121] the Government concluded that it was not worth the effort of pursuing and extraditing him. Indeed, at Leaver's August 24, 2004 bail hearing, the Government indicated that "the reason we didn't seek [Leaver's] extradition is because it is a very cumbersome process."[122] In response to my observation that "it doesn't sound like there was a lot of effort to find [Leaver]," the Government conceded that "we don't extradite people like this."[123]

Rather than face the difficulties involved in pursuing and extraditing this relatively unimportant accused, the Government chose to cease all active efforts and wait passively for chance to deliver Leaver into its hands. This may be a rational allocation of resources. But *Doggett* makes it clear that when the Government chooses to proceed in this manner, it is the Govern-

---

yourself ... in the form of records." Loonie Aff. ¶ 47. Therefore, although the search was unsuccessful in 2000, it was worth repeating later, as Leaver might have left new traces.

**116.** *See* Loonie Aff. ¶ 14. *See also* Consumer Credit Report, Ex. I to Tigue Aff.

**117.** *See* Loonie Aff. ¶ 23.

**118.** *Doggett*, 505 U.S. at 650, 112 S.Ct. 2686.

**119.** *Id.*

**120.** *Id.* at 653, 112 S.Ct. 2686.

**121.** *Id.*

**122.** Transcript of August 24, 2004 Bail Hearing, Ex. C to Tigue Aff., at 9.

**123.** *Id.*

ment and not the defendant that must bear the risks associated with delay. In the Government's case, that risk is that the indictment will be dismissed if the decision to place a low priority on pursuing the accused results in prolonged and prejudicial delays.

Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority. The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.[124]

The Government is more responsible than Leaver for the delay. Therefore, this factor weighs against the Government.

### 5. Leaver Promptly Asserted His Right to a Speedy Trial

 Leaver was not aware—*could* not have been aware—of the indictment until his arrest. He asserted his right to a speedy trial promptly. This factor therefore also weighs against the Government.

### 6. Leaver Was Prejudiced by the Delay

 Leaver is not required to demonstrate any specific prejudice. Prejudice

is presumed where there is a "prolonged and unjustifiable delay . . . in prosecution," and "over time . . . the presumption of evidentiary prejudice grows."[125] "[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."[126] The presumption of prejudice here—where six years have passed since the filing of the indictment, and eleven years since the alleged offense—is strong. Leaver credibly claims that he has forgotten many relevant details, including the identities of art dealers with whom he spoke in 1993 regarding the sale of the painting, and that he has disposed of potentially relevant documents.[127] Leaver also suggests that the memories of other witnesses have surely dimmed over the years.

Leaver has also, however, identified specific prejudice: most importantly, several potentially important witnesses have died during the post-indictment period. William Yancy, the parking attendant working at the garage at which Leaver parked on the night the painting was allegedly stolen from his car, died on January 8, 1999.[128] Leaver claims that Yancy's testimony would have refuted the 1993 report of the Insurance Company's forensic analyst, an important piece of inculpatory evidence.[129] Klaus Larsen and Robin Warrender, individuals with whom Leaver was (he claims) in contact regarding the potential sale of his artwork, have died—Warrender died in 2004.[130]

---

**124.** *Doggett*, 505 U.S. at 657, 112 S.Ct. 2686.

**125.** *Id.* at 655, 657, 112 S.Ct. 2686.

**126.** *Id.* at 657, 112 S.Ct. 2686.

**127.** Leaver claims that he was planning to sell the painting and other artworks to meet his debts, and that he had found ready buyers, and therefore had no motive to commit fraud.

*See* Leaver's Memorandum of Law in Support of Motion to Dismiss ("Leaver Mem.") at 26.

**128.** Because Yancy died shortly after the filing of the indictment, I place little weight on this item of prejudice.

**129.** *See* Leaver Mem. at 29.

**130.** *See id.;* Sept. 24 Leaver Aff. ¶ 19.

The Government questions whether these individuals would have provided useful testimony. For example, the Government points out that Leaver has accused Larsen of "absconding" with the Bank's collateral (other than the painting) after Leaver consigned the collateral to Larsen, and suggests that Larsen would therefore not be willing to testify favorably to Leaver.[131] The Government argues that because these witnesses would not have been useful to Leaver, he is not prejudiced by their unavailability.

It is, of course, possible that these witnesses would not have been as valuable as Leaver claims. However, even if the testimony of these witnesses would have been weak—and, if the Government had promptly located and extradited Leaver, it could have challenged their testimony at trial—their testimony might have sufficed to raise a reasonable doubt. Leaver has therefore succeeded in specifically identifying prejudice to his ability to offer a defense. The Government has failed to rebut the particularized prejudice identified by Leaver, or to overcome the strong presumption of prejudice that accompanies this long delay. This final factor also weighs against the Government.

### 7. The *Doggett* Factors Require Dismissal

All four of the *Doggett* factors weigh against the Government. Therefore, he is entitled to relief, and the indictment is dismissed.

## V. CONCLUSION

For the foregoing reasons, Leaver's motion to dismiss the indictment is granted. The Clerk of the Court is directed to close this motion [# 9], Leaver's motion for discovery [# 18], and this case.

---

131. *See* Gov't Mem. at 34.

SO ORDERED.